The BOARDING HOME ADVOCACY
TEAM, INC., et al.

v.

Helen O'BANNON, et al.

Civ. A. No. 81–3111.

United States District Court,
E. D. Pennsylvania.

Nov. 10, 1981.

Edmond A. Tiryak, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

John O. J. Shellenberger, Robert B. Hoffman, Deputy Attys. Gen., Commonwealth of Pennsylvania, Philadelphia, Pa., for defendants.

### MEMORANDUM

GILES, District Judge.

Pending before this court is plaintiffs' motion for a preliminary injunction pursuant to Fed.R.Civ.Pro. 65(a).

Plaintiffs have instituted the underlying class action for declaratory and injunctive relief on behalf of mentally ill patients who are residents of Philadelphia State Hospital, a state psychiatric facility (hereinafter "PSH"), pursuant to 42 U.S.C. § 1983, the United States Constitution and state law, specifically the Pennsylvania Mental Health Procedures Act, 50 P.S. § 7101 *et seq.* (1976).[1]

The complaint alleges, in essence, that residents of PSH are being unlawfully transferred to the South Mountain Restoration Center, a state nursing home, (hereinafter "South Mountain"). Plaintiffs contend that the transfers are unlawful to the extent that either: (1) patients are involuntarily transferred; or (2) patients who require the psychiatric hospitalization provided at PSH are transferred to South Mountain, which allegedly lacks psychiatric treatment facilities.

Plaintiffs claim that patients who have been transferred to South Mountain have regressed, decompensated and suffered reactivation of their psychoses. As a result of such transfers, plaintiffs allege that former PSH patients have suffered pain and injury and are in danger of severe injury or even death.

Plaintiffs, the Boarding Home Advocacy Team, Inc., a non-profit corporation, and Jane Doe, which is the fictitious name of a resident of PSH, by her next friend and guardian Chaplain Goldwin S. Pollard, commenced the suit on behalf of themselves and on behalf of all residents of PSH who defendants have discharged, or will discharge, from PSH into nursing homes either involuntarily or without supportive medical or social aftercare services necessary to protect the lives and health of such persons.

Defendants are Helen O'Bannon, the Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania (hereinafter "DPW"), Scott Nelson, Deputy Secretary for Mental Health for DPW, and Robert Haigh, Deputy Commissioner for Mental Health for DPW. All defendants are being sued in their individual and official capacities, and are basically being sued for violation of their duties and responsibilities imposed upon them by state law with respect to the mentally ill.[2]

---

1. This court has jurisdiction by virtue of 28 U.S.C. § 1343(3) and (4), this being an action brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983. Jurisdiction is additionally conferred by 28 U.S.C. § 1331 insofar as the action arises under the Constitution and laws of the United States. I do not decide, at this time, whether I shall exercise jurisdiction over plaintiffs' state law claims under the doctrine of pendent jurisdiction.

2. Plaintiffs' original complaint sued Helen O'Bannon only. In their Amended Complaint, plaintiffs sued, in addition, defendants Nelson and Haigh.

On August 3, 1981, plaintiffs filed a motion for a temporary restraining order and preliminary injunction to restrain defendants from transferring approximately 200 residents of PSH to South Mountain, asserting that these transfers would violate the patients' rights to treatment and to decent care as guaranteed by the due process clause of the Fourteenth Amendment and would violate certain state law rights established under the Pennsylvania Mental Health Procedures Act, 50 P.S. § 7101 *et seq.* (1976). By subsequent agreement of the parties, this court reserved ruling on plaintiffs' motion for a temporary restraining order. A hearing was scheduled on September 10, 1981 to present testimony regarding plaintiffs' motion for preliminary injunction. At the hearing, plaintiffs requested injunctive relief restraining defendants from discharging, transferring or moving any resident of PSH to South Mountain unless certain procedures were followed. Such procedures would include requiring defendants to disclose the identities of the proposed transferees to plaintiffs, allowing plaintiffs to review the patients' records, and, if such review did not satisfy plaintiffs as to the appropriateness of the proposed transfer then requiring judicial review of the proposed action.

Plaintiffs contend that the preliminary injunctive relief requested is appropriate and assert several bases for their position:

(1) They assert that plaintiffs' procedural due process rights will be violated by the transfers. They contend that the transfers are involuntary and that the due process clause of the Fourteenth Amendment guarantees the right to a hearing prior to involuntary confinement. Further, they contend that 50 P.S. § 7207, which prohibits the transfer of voluntary mental patients between facilities without their consent, establishes a state created liberty interest which is arbitrarily abrogated by the nonconsensual transfers.

(2) Plaintiffs also assert that the due process clause of the Fourteenth Amendment gives rise to a right to treatment, a right to decent care and a right to be free from unreasonable harm. They contend that these rights are violated by transferring patients to a facility which does not provide adequate psychiatric facilities. Alternatively, plaintiffs contend that certain provisions of the Pennsylvania Mental Health Procedures Act, specifically 50 P.S. § 7103 and § 7104, create liberty interests in a right to decent care and a right to treatment which are arbitrarily abrogated by the transfers.

Defendants oppose plaintiffs' motion for preliminary injunctive relief, asserting that plaintiffs have failed to satisfy the standards applicable to such relief, for the following reasons:

1. Plaintiffs have not demonstrated that they will suffer irreparable harm.

2. Plaintiffs have not established a likelihood of success on the merits, in that:

(a) Neither the organizational nor the individual plaintiff has standing to bring the suit.

(b) No liberty interest is created by state law and even if a liberty interest is so created, the procedures currently in effect satisfy due process.

(c) The right to treatment guaranteed by the due process clause is inapplicable both factually and legally.

After careful consideration of the pleadings, the evidence presented at the hearing, and the papers filed by the parties, plaintiffs' motion for preliminary injunction will be denied. This opinion shall constitute my findings of fact and conclusions of law for purposes of Fed.R.Civ.Pro. 52(a).

## FINDINGS OF FACT

At the hearing on September 10, 1981, the following facts were established:

1. Philadelphia State Hospital ("PSH") is a state-operated hospital providing for the diagnosis, treatment, care or rehabilitation of mentally ill persons. (Amended Complaint ¶ 21, and Answer to Amended Complaint, ¶ 21).

2. South Mountain is a state-owned and licensed nursing home providing skilled and

intermediate nursing care to approximately 815 patients. (Sirolli Tr. 159–60, 187).

3. Most of the patients at South Mountain are former mental patients. (Sirolli Tr. 160).

4. South Mountain's staff has experience in serving former mental patients. (Sirolli Tr. 160, 187–88).

5. South Mountain provides its patients a full range of medical services, including podiatry, speech and hearing, and dental clinics. South Mountain has x-ray, physical and occupational therapy, social services, and psychology departments and a full medical laboratory. Consulting physicians provide services in other areas. (Sirolli Tr. 188). South Mountain offers patients the freedom to participate in a variety of social and recreational activities, and allows some of its residents to freely go off-grounds into the local community. (Sirolli Tr. 190–92, 202).

6. Six physicians are employed on a full-time basis at South Mountain and make daily rounds on their assigned wards. (Sirolli Tr. 186–189).

7. These physicians have a significant degree of experience in working with psychotropic medications. Each physician receives approximately fifty hours of state-funded training per year, a significant portion of which is devoted to psychotropic medications. (Sirolli Tr. 186–87).

8. Two consulting psychiatrists provide psychiatric care on the South Mountain grounds to patients who need it for a minimum of 12 hours a week. (Sirolli Tr. 172). The consulting psychiatrists are available for additional hours as needed, whether on the grounds of South Mountain or by telephone. (Sirolli Tr. 206).

9. If a patient at South Mountain develops a need for in-patient psychiatric care, emergency psychiatric treatment is available at Chambersburg Hospital, located approximately 15 miles from South Mountain, through the Franklin County Mental Health Program. (Sirolli Tr. 173–74). This service has been needed only once during the past two years. (Sirolli Tr. 174).

10. Every new patient admitted to South Mountain is evaluated by the psychology department and South Mountain's psychiatrists within one month of their arrival, or as time allows. (Sirolli Tr. 173).

11. Long-term psychiatric patients, who are able to be discharged from hospitals, generally require only a small amount of a psychiatrists' time—15 minutes every two months. (Houston Tr. 131).

12. Seventeen more PSH patients have been identified for admission to South Mountain. (Houston Tr. 120). All patients currently under consideration for discharge from PSH to South Mountain are voluntary patients. (Defendants' Memorandum in Opposition to Motion for Preliminary Relief, Affidavit of John K. Fong, ¶ 9).

13. Many PSH patients are elderly and have been institutionalized for years. They are more in need of nursing care than active, intensive psychiatric treatment. (Houston Tr. 122–23; Powell Tr. 88).

14. Simply because an individual has some degree of mental illness, or is receiving psychotropic medication, does not necessarily mean that the person requires residence in a psychiatric hospital. (Bartlett Tr. 48–49; Houston Tr. 118–20).

15. Continued residence in a mental hospital, beyond the point clinically required, is detrimental. (Houston Tr. 121).

16. Discharge from PSH followed by admission to South Mountain may be desirable for clinically appropriate patients. (Houston Tr. 144). It is desirable to encourage persons who are capable of coping in society to take the risk of socialization. South Mountain is an environment conducive to that socialization process. (Houston Tr. 119, 121).

17. The decision as to whether a particular PSH resident is suitable for transfer to South Mountain is made by a treatment team, an interdisciplinary group consisting of psychiatrists, psychologists, social workers, an activities person and nursing aides. (Houston Tr. 123). This is the same team which has administered treatment to the patient at the ward level at PSH. (Houston Tr. 123–24).

18. Individual PSH patients identified as possible candidates for discharge and placement at South Mountain must meet established criteria. The patient must: (a) require nursing care; (b) not be overly psychotic, i. e., the symptoms must be in remission so that ongoing psychiatric intervention, such as adjustment of their medication on a daily or weekly basis or restraint of their activities is not required; (c) be over 40 years of age; and (d) not have ongoing contact with his or her family which would be disrupted by placement at the South Mountain facility. (Houston Tr. 121, 123).

19. Treatment teams use medically accepted behavioral criteria in selecting patients for placement at South Mountain under the supervision of the clinical director and the discipline chief of psychiatry, Dr. Houston. (Houston Tr. 120, 123).

20. While administrative officials make decisions as to the aggregate numbers to be discharged, individual decisions as to which patients are appropriate for discharge are made at the ward level by the treatment teams. (Houston Tr. 154), (Eisenuth Tr. 106).

21. The PSH Utilization Review Process determines whether there is adequate documentation to continue third party payment for psychiatric hospitalization of individual patients. It does not control the treatment team's decision as to whether or not an individual patient is to be discharged from PSH. (Houston Tr. 125–126).

22. Typically, individuals selected for South Mountain placement require more nursing care than is available at PSH, e. g., geriatric nursing for the aged. (Houston Tr. 122–23), (Sirolli Tr. 162–63). South Mountain has a higher nurse-to-patient ratio than PSH. (Bartlett Tr. 62).

23. The practice of discharge from PSH to South Mountain is not unique. Discharge occurs fairly constantly so that the number of patients does not exceed the ability of PSH to care for them. (Houston Tr. 118). The facilities into which patients are discharged from PSH vary considerably. Former patients return home, are discharged into a nursing home or are discharged into other structured institutional care facilities. (Houston Tr. 118).

24. Once the PSH treatment team identifies individuals who are appropriate for discharge and placement at South Mountain, a second level of review occurs by the staff at South Mountain. Not all individuals so selected by PSH are accepted by South Mountain. (Houston Tr. 126).

25. South Mountain requires, in addition to the criteria set by PSH for patient discharge, that the candidate for admission have no severe behavior disorder which could result in harm to himself or other patients; that the physical self-maintenance and living functions of the particular patient are appropriate for intermediate or skilled nursing care; and that the individual have no communicable diseases. (Sirolli Tr. 162–64).

26. The fact that an individual receives psychotropic medication will not, of itself, cause the individual to be rejected for placement at South Mountain. (Sirolli Tr. 164).

27. South Mountain's staff follows established procedures in screening patients who have been identified by PSH as appropriate candidates. (Sirolli Tr. 164), (Ex. D–1).

28. First, PSH sends to South Mountain a preliminary admissions package for each candidate, which contains the patient's psychiatric social service evaluation, a copy of the patient's individual treatment plan, and several months of the patient's progress notes. (Sirolli Tr. 164–165).

29. The South Mountain Admissions Committee then convenes and reviews that material. The committee consists of Sirolli, the social work caseworker supervisor, a nursing supervisor, and the medical director. An additional doctor and nurse sometimes attend. The committee decides on a tentative level of nursing care, either intermediate or skilled, for each patient referred. (Sirolli Tr. 165).

30. South Mountain personnel then make an on-site visit at PSH to personally

interview all patients who are candidates for admission to South Mountain. These visits are made by Sirolli, the casework supervisor, and at least one representative from the nursing staff. Each patient is interviewed to determine whether he or she meets South Mountain's admission criteria. They also review each patient's medical charts. (Sirolli Tr. 165–166).

31. On August 18, 1981, South Mountain's staff visited PSH to interview the 17 individuals now identified for admission. (Sirolli Tr. 169).

32. Within a day or two of the visit, the Admissions Committee reconvenes at South Mountain. Decisions are then made whether to admit the candidate, and, if so, what level of nursing care the individual requires. (Sirolli Tr. 167).

33. The director of social services at PSH, Harvey Friedrich, is informed as to which patients have been determined appropriate for admission. PSH then forwards, in advance of admission, a full set of medical records for each patient so that the staff at South Mountain can become familiar with the patients before they arrive. (Sirolli Tr. 167–168).

34. Before actual placement occurs, PSH staff discuss the placement with the candidate and review any objections the patient may have. (Houston Tr. 129).

35. It is not the policy of PSH to place people involuntarily at South Mountain. (Houston Tr. 144–45). If the patient objects to South Mountain, PSH will discharge the patient someplace else. *Id.* I credit the testimony of Dr. Houston, Acting Superintendent for Clinical Services at PSH, that no patient has, in fact, been involuntarily placed at South Mountain. (Houston Tr. 129, 144–45). It is not the policy of PSH to place patients in South Mountain who need in-patient psychiatric treatment. (Houston Tr. 137). Nor is it PSH's policy to place persons who are in need of out-patient psychiatric therapy at South Mountain, unless they also require the structure that is available at South Mountain. (Houston Tr. 139).

36. Each patient from PSH is admitted to South Mountain on a 30-day "trial visit." (Houston Tr. 127).

37. During that time, each patient undergoes evaluation and monitoring by South Mountain staff. If a patient does not adjust successfully to the South Mountain environment, the patient can be returned to the referring state hospital. (Sirolli Tr. 169–170).

38. During the past year, approximately 100 PSH patients were admitted to South Mountain. (Friedrich Tr. 221). Only three proved unable to adjust and were returned to PSH; two within this 30-day trial period, a third thereafter. Those three patients were returned because they exhibited inappropriately aggressive behavior at South Mountain. (Sirolli Tr. 171).

39. It is not unusual for nursing home patients to experience depression. (Bartlett Tr. 59–60).

40. It is common for the first days, or even the first weeks of a transition from PSH to South Mountain to be very difficult for the patient. (Eisenuth Tr. 103–04; Bartlett Tr. 59).

41. Plaintiff's witness, Dr. Bartlett, a psychiatrist, visited several former PSH patients at South Mountain on February 13, 1980. (Bartlett Tr. 58).

42. In particular, he met with Beatrice P. and Eleanor P. (Bartlett Tr. 59). He visited them within a very short time after their admission to South Mountain. (Bartlett Tr. 59).

43. He has not had any contact with either individual since February 13, 1980 and does not know of their present status. (Bartlett Tr. 59).

44. Defendants' witnesses established that Beatrice P. had initial difficulty in adjusting to her new environment at South Mountain. (Sirolli Tr. 182). However, she saw a psychiatrist on a monthly basis from April, 1980 through October, 1980 and showed marked improvement. (Sirolli Tr. 182–83). Beatrice P.'s psychiatric evaluation of August 31, 1981 indicates that she is doing "quite well" at South Mountain. She

is currently being considered for placement outside of South Mountain in a boarding home or personal care facility. (Sirolli Tr. 182–83).

45. Jean V., another former PSH patient discussed by plaintiffs' witnesses, was not on suicide precaution during the period preceding her scheduled visit to South Mountain as alleged by plaintiffs. No such notation appears on her medical order sheet or progress notes. If there were any such indications, they would be noted in accordance with standard PSH procedure. (Friedrich Tr. 213–15, Ex. D–6).

46. Jean V. was a volunteer patient at PSH who discharged herself from PSH prior to a scheduled visit to South Mountain to evaluate the facilities. The psychiatric discharge summary for Jean V. shows that she denied suicide ideation and was in good remission from her psychosis. (Friedrich Tr. 217; Exh. D–7).

47. PSH has experienced difficulty in hiring as many nurses as it wishes to meet patient needs. (Houston Tr. 122).

48. Because of that problem, PSH faces a possible termination of medical assistance certification which could result in a loss of $8–$9 million per year. It would be difficult for PSH to continue to function or exist should this happen. (Houston Tr. 139–40).

49. While resolving this funding problem is a matter of the highest priority to PSH officials, it is second to the priority of providing adequate care and treatment to PSH patients who do require hospitalization. (Houston Tr. 140).

50. Discharge of appropriate patients to South Mountain does have the incidental effect of improving PSH's nurse-to-patient ratio. (Houston Tr. 122). However, I credit the testimony of defendants' witnesses that patients are not discharged from PSH to South Mountain because of funding problems, but rather because, in the medical judgment of PSH, they no longer require a hospitalized environment and can benefit by the nursing and socialization advantages of South Mountain or like facilities.

## DISCUSSION

### 1. *Standing*

As a preliminary matter, I dispose of defendants' contention that the individual plaintiff, Jane Doe, lacks standing to bring this suit since she is not among the group of 17 patients currently scheduled to be discharged and placed in South Mountain. I hold that Jane Doe has standing.

The requirements for standing are that plaintiff must allege such a personal stake in the outcome of the controversy as to warrant federal jurisdiction. "[W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). The injury must be one that can be traced to the challenged action of defendant, *id.*, at 41, 96 S.Ct. at 1925. It can be either threatened or actual, *id.*, (citing *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973)). Here, assuming justiciability of plaintiffs' claims, Jane Doe has demonstrated at least a threatened injury to her as a result of defendants' discharge policies, since she is an actively psychotic patient and resident of PSH. As such, she may be subject at any future time to the discharge policies alleged by plaintiffs if her condition improves sufficiently. Thus, she has a "personal stake" in the outcome of the litigation.[3]

### 2. *Standards for Granting Preliminary Injunctive Relief*

Temporary injunctive relief is an extraordinary remedy which should be granted only in exceptional circumstances since it

---

3. Given my holding as to Jane Doe, I do not reach the question of the standing of BHAT which is raised separately in defendants' motion for summary judgment. Nor does my holding as to Jane Doe decide the issue of her appropriateness as class representative.

is based on a limited hearing that produces an abbreviated set of facts. *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 357 (3d Cir. 1980); *Skehan v. Board of Trustees of Bloomsburg State College*, 353 F.Supp. 542 (M.D.Pa.1973). It has been consistently held in this circuit that four factors must be examined and balanced to ascertain the propriety of a preliminary injunction. The moving party must generally show:

(1) a reasonable probability of eventual success in the litigation;

(2) that the moving party will suffer irreparable harm if the relief is not granted. In addition, the court should consider, when relevant,

(3) the possibility of harm to the other interested persons from the grant or denial of the injunction; and

(4) the public interest.

*Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980); *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 356–57 (3d Cir. 1980); *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 600–01 (3d Cir. 1979), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980); *Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 814–15 (3d Cir. 1978). Furthermore, when as in this case, the preliminary injunction is directed not merely to preserving the status quo, but to providing mandatory relief, the moving party bears a particularly heavy burden. *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980). Applying these standards to the facts as set forth above, I find that plaintiffs' motion for preliminary injunction must be denied.

### A. Plaintiffs Have Not Demonstrated a Reasonable Likelihood of Success on the Merits

■ The gravamen of plaintiffs' complaint is that the procedures and policies adopted by defendants regarding the discharge of PSH patients to South Mountain do not adequately protect them from being discharged either involuntarily or from being discharged into an institution which lacks adequate psychiatric treatment facilities. These discharge policies and procedures allegedly violate certain liberty interests created either by state law or by the due process clause of the Fourteenth Amendment, including the right to treatment, the right to decent care, the right to be free from unreasonable harm and the right to a hearing prior to transfer.

I have serious doubts as to whether the purported liberty interests claimed by plaintiff are appropriately asserted in this case. A liberty interest can spring from the Constitution itself or can arise from state statutes or practices. *Rennie v. Klein*, 653 F.2d 836, 842 (3d Cir. 1981). The plaintiffs claim liberty interests springing from both sources. Treating the constitutionally grounded liberty interests first, plaintiffs claim that the right to treatment, the right to decent care, and the right to be free from unreasonable harm arise by virtue of the due process clause of the Fourteenth Amendment. Plaintiffs have cited no authority defining the scope of these liberty interests to include persons, such as plaintiffs, who are voluntarily committed to mental institutions and who wish to remain in a more restrictive institution once discharge to a less restrictive environment is medically determined to be appropriate. In this circuit, the cases which have considered the right to treatment and the right to decent care have done so in the context of involuntarily committed patients. *Scott v. Plante*, 641 F.2d 117 (3d Cir. 1981) (appeal pending). *Romeo v. Youngberg*, 644 F.2d 147 (3d Cir. 1980), *cert. granted*, —— U.S. ——, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981) (en banc). *Rennie v. Klein*, 653 F.2d 836 (3d Cir. 1981) (en banc).

Similarly it is not clear that a liberty interest in consensual transfers arises under the due process clause. Plaintiffs assert that since one cannot be involuntarily committed without a hearing, one cannot be involuntarily transferred without a hearing. What plaintiffs do not recognize is that voluntary patients may not have a constitutional right to remain at a particular institution once discharge is deemed appropri-

ate. *See* 50 P.S. § 7206(c) (facility not required to continue in-patient treatment once director determines such treatment not medically indicated). *Cf. O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (no due process rights implicated in decertification of nursing home and subsequent transfer of patients.) In any event, the application of these rights is sufficiently unclear at this juncture to warrant denial of preliminary injunctive relief.

Similarly, plaintiffs' claims to state-created liberty interests are subject to doubt. The purported source of the state-created liberty interest in consensual transfers is 50 P.S. § 7207, which requires written consent by a voluntary patient before transfer. Since the statute on its face applies to transfers between mental institutions and not to discharges to a nursing home, it is not clear under these facts that it creates a liberty interest in consensual discharge. Plaintiffs' alternative contention is that state-created liberty interests in decent care and adequate treatment arise under 50 P.S. § 7103 and § 7104, which specify that adequate treatment shall be given to both voluntary and involuntary patients. However, these sections must be read in light of 50 P.S. § 7206(c), which provides that patients are subject to discharge if they are no longer deemed medically appropriate for in-patient psychiatric care. Given the latter section, it is at least arguable that the scope of any right to treatment or decent care created by state statute does not encompass a right to remain at PSH once discharge has been deemed medically appropriate.

Even assuming these liberty interests are appropriately asserted under the facts of this case, a conclusion which is far from clear, there is no evidence that these interests have been arbitrarily abridged by defendants' policies and procedures.

The general approach for testing challenged state procedures under a due process claim has been summarized as follows. Assuming the existence of a protectible liberty or property interest, three factors must be considered in determining "what process is due" to protect the asserted interest: (1) the private interest; (2) the risk of an erroneous decision through the procedures used as well as the value of any additional safeguards, and (3) the governmental interest, including fiscal or administrative burdens which would be imposed by other procedural requirements. *Rennie v. Klein*, 653 F.2d 836, 848 (3d Cir. 1981); *Parham v. J.R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979) (quoting *Matthews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)).

Under these criteria, I find that the procedures established satisfy due process. For purposes of the present discussion, I shall assume that a private interest exists in consensual transfers and in receiving treatment that is both appropriate and adequate to the needs of the patient, whether this latter interest is labelled as right to adequate treatment, to decent care, or to be free from unreasonable harm.

Applying the second factor set forth above, I find that the procedures adopted adequately protect these interests. The credited testimony is that logical and thorough procedures have been established both at South Mountain and PSH to assure that persons identified for discharge and admission to South Mountain are appropriately placed. Treatment teams at PSH, who are very familiar with the individual patient concerned, make a placement decision based on certain rational criteria, including age, degree of mental disease, lack of family contact, requirement for nursing care. These placement decisions are then subject to a second level of review by the staff at South Mountain based on certain additional logical criteria, and based on an on-site interview of the patient conducted by the South Mountain staff. South Mountain is free to reject the potential candidates for discharge from PSH. There is even a provision for a thirty (30) day "trial visit" period during which PSH patients are subject to a period of particularly close evaluation to determine compatibility.

Thus, professional judgment is exercised both at PSH and South Mountain to assure

that patients will not be a danger to themselves or to others upon placement in the less restrictive environment of South Mountain. Essentially, defendants have made a medical judgment that patients placed in South Mountain are capable of being discharged and will benefit from the care they receive there. Ultimately, defendants hope that the individual's quality of life will be improved by the discharge.

The elaborate two-level system of review established has apparently been effective, on the whole, since all but 3 of the last 100 persons discharged to South Mountain remain there. Plaintiffs do not directly attack the procedures themselves. Rather, they challenge their application asserting that defendants have improperly discharged patients to South Mountain simply to reduce the nurse-patient ratio, so as to be eligible for federal funding. As evidence of the inappropriate application of the procedures, plaintiffs cite the case of Jean V., a patient who was slated for transfer to South Mountain when she was allegedly known to be suicidal. However, the evidence established that this patient was not on suicide precaution and was in remission from her psychosis at the time she was considered for placement. Under the circumstances, this individual's case hardly establishes that suicidal or actively psychotic patients are improperly admitted to South Mountain.

Plaintiffs also presented testimony by a staff member/social worker at PSH who noticed an unprecedented rise in discharges to South Mountain. The import of this testimony was that many persons whom he had identified as patients in need of in-patient psychiatric care were being discharged in order to reduce the nurse-patient ratio for federal funding purposes. However, subsequent testimony established that the review process performed by this witness was an administrative process undertaken to determine patients' eligibility for third party payment. His review was separate from and not binding upon the medical judgments exercised by the treatment team. I credit the testimony of defendants' witnesses that decisions as to patient discharge and placement are made at the ward level, based on an individualized assessment of the patient's needs, and are not governed by administrative concerns about the nurse-patient ratio.

Aside from a coincidental rise in the number of discharges, plaintiffs do not establish sufficient evidence that medicaid concerns predominate PSH's concern for the appropriate placement of its patients. To the contrary, there was testimony that while it is desirable to reduce the nurse-patient ratio, the first priority is always proper patient care. Divergent medical judgments, and not any arbitrary, erroneous or improper action on the part of the defendants, lie at the heart of the dispute. The staffs of South Mountain and PSH have each made a medical judgment, based on rational criteria, that certain patients are capable of being discharged to a less institutional and less restrictive environment. Plaintiffs disagree with the medical judgment made in some of the cases. This disagreement does not amount to a violation of plaintiffs' asserted liberty interests.

In order to protect against the alleged inappropriate transfer of PSH patients to South Mountain, plaintiffs propose the following additional safeguards: a review by a medical professional chosen by plaintiffs and a review by the court. Neither safeguard is required by due process. In *Parham v. JR*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), the United States Supreme Court found, in the context of procedures established for the commitment of a juvenile,

"[d]ue process is not violated by use of informal, traditional medical investigative techniques.... The mode and procedure of medical diagnostic procedures is not the business of judges. What is best for a [patient] is an individual medical decision that must be left to the judgment of physicians in each case. We do no more than emphasize that the decision should represent an independent judgment of what the [individual] requires and that all sources of information that

are traditionally relied on by physicians and behavioral specialists should be consulted."

*Id.* at 607–08, 99 S.Ct. at 2506–07.

Here, there is every reason to believe that defendants' procedures satisfy due process, since they provide for evaluation and review by competent medical and professional personnel at both hospitals.

Neither is the further protection of an adversary hearing, as advocated by plaintiff, required by due process. As the court further stated in *Parham v. JR*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979):

> Although we acknowledge the fallibility of medical and psychiatric diagnosis—(citations omitted) we do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision—to an untrained judge or administrative hearing officer after a judicial type hearing. . . . [T]he supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real. (citations omitted).

*Id.* at 609, 99 S.Ct. at 2508. *See also Rennie v. Klein*, 653 F.2d 836, 848–851 (3d Cir. 1981).

Any value the additional safeguards proposed by plaintiffs may have are far outweighed by the burden upon the state, both fiscally and administratively, of imposing the requirement proposed by plaintiffs. Thus, I find that the procedures adopted by defendants satisfy the requirements of due process.

For the reasons set forth above, I find that plaintiffs have not established a reasonable likelihood of success on the merits sufficient to warrant the imposition of the extraordinary remedy of preliminary injunctive relief.

### B. *Plaintiffs Have Not Demonstrated That They Will Suffer Irreparable Harm*

Neither have plaintiffs demonstrated that they will suffer immediate irreparable injury as a result of defendants' policies and procedures. There is simply no evidence that plaintiffs have suffered any harm as the result of the discharge procedures adopted by defendants.

Basically, plaintiffs assert that they have been involuntarily transferred in violation of their right to consent to such transfers. Even if such a right exists, it has not been established that any patient has been, or is likely to be, transferred involuntarily. The testimony indicated that patients are given an opportunity to voice objections to their discharge to South Mountain, that the staff at PSH makes every attempt to resolve these objections, and that there is no policy or practice at PSH of involuntarily discharging patients to South Mountain. The most that plaintiffs have established is that some persons are disgruntled and may go through a difficult transition period upon discharge to South Mountain. However, it was also established that this is a natural and anticipated reaction on the part of some patients and that, in a large majority of cases, these patients will adjust admirably to their new environments once the initial adjustment problems are overcome.

For example, plaintiffs' witnesses stated that several former PSH patients they visited at South Mountain in February, 1980 were more delusional following the transfer and expressed strong desires to return to PSH. However, defendants established that this visit occurred during the transition period between institutions, at a time when the patients were particularly anxious. Since the February visit there is testimony that these same patients have adjusted quite well. Thus, the record to date does not demonstrate that plaintiffs have been irreparably harmed by involuntary discharges.

Similarly, plaintiffs have not demonstrated that they have been irreparably harmed by denial of adequate or appropriate care at South Mountain in violation of their asserted rights to treatment, to decent care, and to be free from unreasonable harm. The testimony establishes that there are adequate treatment facilities for the PSH pa-

tients who are placed at South Mountain. The staff at South Mountain has familiarity with former mental patients and has received extensive training in the administration of psychotropic medication. Further, psychiatric services are available at South Mountain either through the visiting psychiatrist who is available 12 hours per week (or as need requires) or, on an emergency basis, through the Chambersburg Hospital which is within a 15 mile radius of South Mountain. No evidence was presented that former PSH patients desiring psychiatric services at South Mountain have ever been denied them.

Rather than denying adequate care to former PSH patients, the evidence establishes that these patients are granted care which, in the judgment of the staffs of both institutions, is more appropriate for them. Under the facts established, there is simply no evidence that plaintiffs have been deprived of any of their asserted interests or have been irreparably harmed by defendants' conduct. Thus, a denial of plaintiffs' motion for preliminary injunction is appropriate.

C. *The Public Interest and the Possibility of Harm to Other Interested Parties*

I find that it is also appropriate to consider the possibility of harm to other interested parties and to consider the public interest implicated by the grant or denial of the preliminary injunction requested by plaintiffs.

To some extent, in this case, the two interests are intertwined. The injunction sought by plaintiffs would interfere with the considered medical judgments made by the staff at both PSH and South Mountain that certain patients should be discharged. The requested relief would inject two additional tiers of review into the process of evaluation for discharge. To impose such relief at this stage of the proceedings, absent any clear justification on the record for doing so, may result in undesirable consequences for both PSH patients and the public.

For example, those patients who no longer require institutionalization at PSH will be prevented from being discharged, or, at the least, will suffer considerable delay prior to discharge. The testimony has established that a patient's best interests are served by placing him in the least restrictive environment as soon as he is deemed capable of adapting to it. In addition, if patients are forced to remain at PSH unnecessarily, conditions may well become over-crowded, with the result that PSH patients who are in need of the care provided at PSH will be competing with less needy patients for the limited resources available. Moreover, there was testimony that if patients are not discharged when, in the considered medical opinion of the PSH staff discharge is appropriate, PSH may not be able to accommodate new patients in need of hospitalization.

### 3. *Conclusion*

After balancing the factors set forth above, I find that plaintiffs' motion for preliminary injunction is denied.