FRANCIS M. SAVASTANO, as Director of the Mental Hygiene Legal Service, et al., Respondents, v GEORGE NURNBERG, as Director of Psychiatry, Queens Hospital Center, et al., Appellants.

Second Department, December 11, 1989

### APPEARANCES OF COUNSEL

*Peter L. Zimroth, Corporation Counsel (Larry A. Sonnen-shein* and *Fred Kolikoff* of counsel), for George Nurnberg, appellant.

*Robert Abrams, Attorney-General (Arnold D. Fleischer, An-drea Green* and *Robert L. Schonfeld* of counsel), for Steven Katz, appellant.

*Francis M. Savastano, pro se,* and *Raymond J. Baltch, Thomas Behrendt, William M. Brooks* and *Dennis B. Feld* for respondents.

*Onek, Klein & Farr (Joel I. Klein, Christopher D. Cerf* and *David A. Bono* of counsel), for New York State Psychiatric Association, *amicus curiae.*

*New York Lawyers for the Public Interest, Inc. (Herbert Semmel* and *Marilyn A. Kneeland* of counsel), for Project Release and Alliance of Psychiatrically Labelled Persons, Inc., *amici curiae.*

### OPINION OF THE COURT

LAWRENCE, J.

■ This appeal concerns the right of the defendants to authorize the transfers of involuntarily admitted mentally ill patients, without their consent or a prior judicial hearing, from municipal facilities to psychiatric facilities operated by the New York State Office of Mental Health. We find that the statutory and regulatory scheme *(see,* Mental Hygiene Law § 29.11; 14 NYCRR 517.4) which permits the challenged transfers does not violate the Due Process Clause of either the US Constitution (US Const, 14th Amend, § 1) or the NY Constitution (NY Const, art I, § 6).

### I

The over-all legislative scheme for the involuntary hospitalization of those individuals who have "a mental illness for which care and treatment as a patient in a hospital is essential" (Mental Hygiene Law § 9.01) contemplates that the patient's constitutional rights will be protected by provisions for judicial review at various stages of the patient's hospitalization. Article 9 of the Mental Hygiene Law permits the director of any hospital to receive- and retain, as a patient, any person alleged to have a mental illness for which "immediate observation, care, and treatment in a hospital is appropriate and which [mental illness] is likely to result in serious harm to himself or others" *(see,* Mental Hygiene Law § 9.39 [a]). The authorization of the examining physician is sufficient to retain such a person initially *(see,* Mental Hygiene Law § 9.39 [a]). Retention of the patient for more than 48 hours requires confirmation of the first physician's finding by a second physician who is a member of the psychiatric staff of the hospital *(see,* Mental Hygiene Law § 9.39 [a]). However, immediately upon admission, the patient must be informed in writing of his or her status and rights, including the availability of the Mental Hygiene Legal Service (Mental Hygiene Law § 9.07

[a]), and, at any time after admission, the patient *may request a court hearing* on the need for retention (Mental Hygiene Law § 9.39 [a], [b]). Even if the patient does not seek court review, involuntary retention after 15 days is only authorized by compliance with the provisions governing "involuntary admission on application supported by medical certification" *(see,* Mental Hygiene Law § 9.39 [b]). This requires, in pertinent part, a new medical determination made by two examining physicians (Mental Hygiene Law § 9.27 [a]), confirmed by a third physician who is a member of the psychiatric staff of the hospital (Mental Hygiene Law § 9.27 [e]), that the patient is in need of involuntary care and treatment (Mental Hygiene Law § 9.27 [e]; § 9.01). Upon admission under this provision, the Mental Hygiene Legal Service must be notified and the patient may not be sent to another hospital by any form of involuntary admission without further notice to the Mental Hygiene Legal Service (Mental Hygiene Law §§ 9.07, 9.27 [f]; § 9.29).

A patient who has been involuntarily admitted pursuant to Mental Hygiene Law § 9.27 may be retained for up to 60 days from the date of admission on medical certification (Mental Hygiene Law §§ 9.31, 9.33). However, at anytime during the 60-day period a patient *may request a court hearing* on the question of the need for involuntary care and treatment (Mental Hygiene Law § 9.31 [a]). At such a hearing, the court shall determine if the patient is to be retained or discharged (Mental Hygiene Law § 9.31 [c]). Further, the court may determine whether the patient should be transferred to a State psychiatric or private facility or released to the care and custody of the relatives of the patient or "a committee of his person" (Mental Hygiene Law § 9.31 [c]). Within 30 days after this court order authorizing retention and/or transfer, a patient may seek a rehearing before a jury or another Justice, or a stay of the order pending appeal (Mental Hygiene Law § 9.35).

Where a patient, admitted on medical certification, does not seek a hearing challenging his involuntary admission during the 60-day period after his admission, the hospital must apply for a court order within that period to retain the patient.[1] The court, after a hearing, if one is timely requested, may order

---

1. If the patient has requested a hearing and has been denied release, the hospital must apply for a retention order within 30 days of the denial (Mental Hygiene Law § 9.33 [a]).

retention for up to six months, either at the requesting facility or at a State or private facility (Mental Hygiene Law § 9.33 [b]). The statute provides for a further retention order of up to one year and then retention orders for periods not to exceed two years (Mental Hygiene Law § 9.33 [d]).

The section under review, Mental Hygiene Law § 29.11, provides, in pertinent part, that the Commissioner of the New York State Office of Mental Health (hereinafter OMH) "may order or approve the transfer of a patient from one facility to another appropriate facility" (Mental Hygiene Law § 29.11 [a]) at any time, although "[n]o transfer shall be made to any facility other than a department facility without the consent of the facility to which the patient is transferred" (Mental Hygiene Law § 29.11 [d]). If, at the time the transfer is ordered, there is pending a request for a court hearing or decision on the question of the need for involuntary care and treatment, "the commissioner may either (i) stay his order of transfer until completion of the hearing, or (ii) direct the transfer to take place and the director of the state facility shall be substituted in all legal proceedings regarding continued retention of the patient" (Mental Hygiene Law § 29.11 [i]). In addition, when an order of transfer is issued, the receiving facility may retain the patient only for the balance of the period authorized for the retention of the patient, based upon the date of admission to the facility from which the patient is transferred (Mental Hygiene Law § 29.11 [j]).

Pursuant to his statutory authority, the Commissioner of OMH has promulgated the elaborate procedures to be followed concerning the transfer of involuntarily admitted mentally ill patients. In this action, these proceedings are attacked as unconstitutional.[2] In pertinent part, an application for an order of transfer may be made by the patient, by a significant other or guardian of the patient, or by the sending hospital's director or the designee thereof (14 NYCRR 517.4 [a]). A transfer is authorized when it is determined to be in the best interests of the patient.

"In making the determination of which hospital better serves the best interests of the patient, the following factors shall be considered:

2. While "[a] voluntary or informal patient may be transferred only with his consent" (Mental Hygiene Law § 29.11 [b]), no claim has been raised that this distinction constitutes a violation of the rights of involuntarily admitted patients under the Equal Protection Clause (US Const 14th Amend).

"(i) The patient's need for continued inpatient treatment.

"(ii) The patient's need for services which are more readily available or which can be more effectively provided at the receiving hospital.

"(iii) Proximity of the sending and receiving hospitals to the patient's significant others.

"(iv) The ability of the sending hospital to provide adequate overall treatment of the patient, as affected by:

"(a) overcrowding;

"(b) reduction or elimination of services beneficial to the patient; and

"(c) reduction in the number of approved beds.

"(v) The ability of the receiving hospital to provide adequate overall treatment of the patient, as affected by:

"(a) overcrowding;

"(b) the availability of services beneficial to the patient; and

"(c) bed capacity" (14 NYCRR 517.4 [d] [1]).

In addition, the patient must also be found to be a suitable candidate for transfer pursuant to the following criteria:

"(i) The patient must meet the psychiatric admissions criteria of the receiving hospital.

"(ii) In addition to satisfying subparagraph (i) of this paragraph, a patient to be transferred from a municipal or general hospital in New York City to a hospital operated by the Office of Mental Health must satisfy the following requirements, unless waived by the commissioner or a designee thereof:

"(a) the patient must not require acute psychiatric care; and

"(b) the patient must require, or be expected to require in the future, intermediate or long-term psychiatric care.

"(iii) The patient must be medically cleared" (14 NYCRR 517.4 [d] [2]).

Further, "[n]o request for the transfer of an objecting patient shall be made by the sending hospital until such patient has been given an opportunity to appeal such request to the sending hospital's director" (14 NYCRR 517.4 [c] [3]). The director "may designate the clinical director, any unit chief or psychiatrist not of the unit where the patient receives or has received care, or any supervisor of such unit chief or psychiatrist, to hear an appeal" (14 NYCRR 517.4 [c] [3] [i]). While the appeal may be conducted "informally, without adhering to the rules of evidence and recordkeeping", the Hearing Officer

shall "(a) review the patient's clinical history; (b) give the patient, the Mental Hygiene Legal Service and any patient representative an opportunity to discuss the patient's objections to the transfer * * * and (c) consider the criteria for transfer described in [14 NYCRR 517.4 (d)] and determine whether, on balance, the patient's best interests would be served by transfer to another hospital" (14 NYCRR 517.4 [c] [3] [i]). The sending hospital is required to inform the receiving hospital if a patient objects to the transfer. The receiving hospital is to obtain a summary of the hearing procedure conducted for any patient objecting to the transfer (see, 14 NYCRR 517.4 [k]), and shall have an opportunity to examine the patient prior to admission (see, 14 NYCRR 517.4 [g] [1] [ii]; [2] [iii]). The receiving hospital may reject the patient if it is found that admission would be or is inappropriate (see, 14 NYCRR 517.4 [g] [1] [iv]; [2] [v]). Unless an immediate transfer would be in the best interests of the patient, the order of transfer shall not issue, or if already issued, it shall be stayed until the completion of any court hearing on the issue of the continued retention of the patient (see, 14 NYCRR 517.4 [h] [2] [i], [ii]).

A patient who is not satisfied with a transfer determination may challenge it by commencing a proceeding pursuant to CPLR article 78 and may seek injunctive relief staying the transfer pending judicial review (see, CPLR 7805).

## II

The instant case involves three named patients who were all involuntary patients admitted on the basis of medical certification pursuant to Mental Hygiene Law § 9.27 to Queens Hospital Center (hereinafter QHC), a general municipal hospital with a 46-bed in-patient psychiatric unit. This facility provides short-term acute care to patients who have psychiatric episodes lasting from 21 to 28 days.

Due to a large number of emergency involuntary psychiatric admissions and based upon his perception that these three patients required intermediate or long-term care and could no longer be adequately cared for at QHC, within 60 days of the patients' commitment the defendant Dr. George Nurnberg, as Director of Psychiatry at QHC, applied for orders of transfer pursuant to Mental Hygiene Law § 29.11 and 14 NYCRR 517.4 to the Creedmoor Psychiatric Center (hereinafter Creedmoor), a psychiatric facility operated by OMH and located in Queens County.

The patients objected to the proposed transfers and presumably invoked the appeals procedure provided for in 14 NYCRR 517.4 (c) (3) (i). After the appeals, it was determined that the patients' best interests would be served by transferring them to Creedmoor. After screening the patients, Creedmoor agreed to accept them. The defendant Dr. Stephen Katz, as the Commissioner of OMH, then granted the transfer applications of QHC and ordered the transfers of the patients to Creedmoor.

However, before any transfers were effectuated, the then Director of the Mental Hygiene Legal Service commenced the instant action on behalf of the three named patients pursuant to CPLR 3001, seeking declaratory and injunctive relief to prevent the transfers from QHC to Creedmoor without the patients' consent and a prior judicial hearing. In the complaint, it was claimed that although the transfer decisions were allegedly made in the patients' best interests, consideration was not given to some of the patients' concerns, to wit, that a patient admitted to a short-term facility had a reasonable expectation of continuity of care and treatment at that facility, and that a patient transferred from a municipal facility to a State psychiatric facility was "stigmatized" by being labeled a "chronic" mentally ill patient. The complaint also alleged that the administrative appeal procedure set forth in 14 NYCRR 517.4 was ineffective because it did not provide a meaningful opportunity for the patients to be heard, to confront witnesses, and present testimony, did not provide for the active participation of legal counsel, application of the rules of evidence, the maintenance of a record of the proceeding, and a decision by an independent, impartial decision maker based on proof by clear and convincing evidence.

The Supreme Court, Queens County (Lonschein, J.), granted the patients a temporary restraining order prohibiting their transfers pending the hearing of their application for a preliminary injunction. The defendants separately opposed the application for a preliminary injunction and cross-moved to dismiss the complaint for failure to state a cause of action. The defendant Katz also sought a declaration that the statute and regulation at issue were constitutional insofar as challenged by the patients.

After hearing oral argument by counsel, the Supreme Court, Queens County (Di Tucci, J.), noted in relevant part, that although the defendants had cross-moved to dismiss the complaint for failure to state a cause of action, the parties had

agreed to have the action decided on the merits *(Savastano v Nurnberg,* 139 Misc 2d 593, 594). The court further noted that while the three named patients had been discharged from QHC without transfer to Creedmoor, thereby rendering the plaintiffs' motion for a preliminary injunction academic, the action should not also be dismissed as academic because a significant constitutional issue had been raised, and the challenged statutory and regulatory scheme potentially could affect other members of the public *(Savastano v Nurnberg, supra,* at 599-600).

With respect to the challenge to the transfer of involuntarily admitted patients, the Supreme Court specifically declared that Mental Hygiene Law § 29.11 and 14 NYCRR 517.4 were unconstitutional in that the transfer procedures violated the due process rights of the objecting patients under the United States and New York State Constitutions *(Savastano v Nurnberg, supra,* at 604).

## III

■ We agree with the Supreme Court that while all the named patient plaintiffs had been discharged prior to their proposed transfers, in light of the significant issue raised, the likelihood of repetition and the need to clarify the law for the participants, it is appropriate to determine the issues rather than dismiss the appeal as academic *(see, Matter of Savastano v Prevost,* 66 NY2d 47, 48, n; *Hasenbein v Siebert,* 83 AD2d 875, 876, *affd* 56 NY2d 853).

■ It is beyond cavil that involuntarily admitted mentally ill patients have liberty interests subject to Federal and State constitutional requirements of due process, which are not abandoned at the facility door *(see, Youngberg v Romeo,* 457 US 307, 315-316; *Rivers v Katz,* 67 NY2d 485, 492-498; *Ughetto v Acrish,* 130 AD2d 12, 25; *see also, Vitek v Jones,* 445 US 480, 494). Nevertheless, "only a limited range of interests fall within" the mandate of the constitutional requirements *(Hewitt v Helms,* 459 US 460, 466). We find that neither under the Federal nor State Constitution is there any basis for requiring a judicial hearing prior to the transfer of patients who object to their transfer from municipal facilities to State psychiatric facilities.

The Supreme Court, while correctly noting that the patient had no constitutional right to be treated at any particular facility, nevertheless held that the challenged transfers would

result in a *major* change in the nature and length of confinement of these patients, and observed that such changes were normally imposed only when it was determined that an individual was in need of intermediate or long-term confinement, thereby invoking the Due Process Clauses of the Federal and State Constitutions.

However, no evidence was submitted that the transfers from municipal facilities to State psychiatric facilities would *further* restrict the patients' liberty *(see, Addington v Texas,* 441 US 418, 429), or that their confinement would be unnecessarily prolonged. Upon such a transfer, the receiving facility may only retain the patient for the balance of the period for which the sending facility was authorized to retain the patient without further court order (Mental Hygiene Law § 29.11 [j]). In addition, there was no evidence presented that the patients in municipal facilities were *further* stigmatized by their transfer to State psychiatric facilities or that such a transfer resulted in the labeling of an individual as a " 'chronic mental patient' " *(see, Addington v Texas,* 441 US 418, 429, *supra).* As to the claim that such transfers normally were not imposed unless an individual was in need of intermediate or long-term confinement, "the mere fact that [New York] has created a careful procedural structure" concerning the challenged transfers does not "indicate * * * the existence of a protected liberty interest" *(Hewitt v Helms,* 459 US 460, 471, *supra).* Mental Hygiene Law § 29.11 does not use any mandatory language prohibiting transfers unless certain substantive criteria are met; the statute permits "[t]he transfer * * * of patients * * * at the sole discretion of the appropriate mental hygiene official, without court intervention" *(People ex rel. Powell v Warden,* 73 AD2d 654, 656). In addition, Mental Hygiene Law § 29.11 (i) and (j), which now permit a transfer during the pendency of any court proceeding, but limit the retention of the patient to the original period authorized by statute at the time of transfer, were enacted for the purpose of allowing: "expeditious and necessary transfers of involuntary patients from hospitals to State psychiatric centers while ensuring that such transfers [would] not cause any delay in any pending hearing to which the patient [was] entitled under Article 9 of the Mental Hygiene Law * * * by providing for the substitution in such proceeding of the director of the receiving facility for the director of the transferring facility * * * [and that] the order of transfer would not alter or extend the authorized period for a patient's retention by a

psychiatric facility" (mem of the Office of Mental Health in support of Mental Hygiene Law § 29.11 [i], [j], L 1984, ch 938, § 1, reprinted in 1984 NY Legis Ann, at 321-322).

Similarly, we find no merit to the patients' further contention that the current regulatory language in 14 NYCRR 517.4 created a constitutionally protected liberty interest. That regulation does not provide that a patient must not be transferred unless certain criteria are met, and, in fact, specifically provides that the Commissioner of OMH retains the discretion to waive the consideration of certain criteria prior to authorizing a transfer (see, 14 NYCRR 517.4 [d] [2]). Therefore, it cannot be said that the regulatory scheme uses "explicitly mandatory language in connection with requiring specific substantive predicates" that "demands a conclusion that the State has created a protected liberty interest" (Hewitt v Helms, 459 US 460, 472, supra).

■ Further, we do not find that the New York State Constitution "accords greater protection" (People v P. J. Video, 68 NY2d 296, 302, cert denied 479 US 1091) than the United States Constitution to the patients with respect to the issue of a pretransfer judicial hearing. Contrary to the patients' contentions that New York State has historically afforded them the opportunity for prior judicial review when Government officials have attempted to transfer them, the authority of the Commissioner of OMH to transfer involuntarily admitted mentally ill patients without court intervention (currently embodied in Mental Hygiene Law § 29.11), has historically existed since 1933 in virtually its current form (see, L 1933, ch 395, § 1; L 1944, ch 666, § 4; L 1946, ch 365, § 1; L 1951, ch 183, § 1; L 1953, ch 482, § 1; L 1961, ch 72, § 1; L 1964, ch 738, § 22; see also, Matter of MacCurdy, 268 App Div 954; Tittler v La Burt, 22 Misc 2d 406, 407-408, affd 13 AD2d 700; Matter of Kruse, 205 Misc 964, 968). In addition, the predecessor regulation to 14 NYCRR 517.4 did not provide for any pretransfer judicial hearing where no court proceedings were pending involving the patients (see, 14 NYCRR former 17.2).

■ If we were to assume that New York's statutory and regulatory scheme limited the Commissioner's discretion to authorize the challenged transfers and thereby created a liberty interest to be protected, we would still hold that the Supreme Court's determination that the challenged provisions did not satisfy the requirements of due process of law was in error. Whether the challenged provisions are "constitutionally

sufficient" requires consideration of "[f]irst, the private inter-
est that will be affected by the official action; second, the risk
of an erroneous deprivation of such interest through the
procedures used, and the probable value, if any, of additional
or substitute procedural safeguards; and finally, the Govern-
ment's interest, including the function involved and the fiscal
and administrative burdens that the additional or substitute
procedural requirement would entail" *(Mathews v Eldridge,*
424 US 319, 334-335). As we have noted, there is no evidence
that the transfers challenged herein impose additional restric-
tions or stigma upon the patients, or that the transfers will
unduly delay the release of such patients. The regulatory
scheme, if followed, poses only a small risk of erroneous
deprivation and this risk would not be significantly reduced by
superimposing the requirement of a pretransfer judicial hear-
ing. The fact that the patients involved in this proceeding
were released prior to any transfer and within a short period
of time after it was determined that transfer for intermediate
or long-term care was necessary does not require a finding
that the regulatory procedures are inadequate. While "the
fallibility of medical and psychiatric diagnosis" has been
recognized, "the shortcomings of specialists can[not] always be
avoided by shifting the decision from a trained specialist using
the traditional tools of medical science to an untrained judge
or administrative hearing officer after a judicial-type hearing.
* * * [T]he nonspecialist decision maker must make a medi-
cal-psychiatric decision" *(Parham v J.R.,* 442 US 584, 609). As
to the former patients involved herein, "the record does not
support a finding that [the] transfer decisions [were] made in
bad faith, out of pique, or on irrational grounds" *(Cruz v
Ward,* 558 F2d 658, 662, *cert denied* 434 US 1018). Clearly,
"[n]o psychiatrist is a clairvoyant; some diagnoses that are
perfectly defensible at the time will, in retrospect, turn out to
be erroneous" *(Cruz v Ward, supra,* at 662).

We similarly find without merit the Supreme Court's
concern that the challenged regulation precludes the director
of the transferring facility from deciding the issue of transfer
in an unbiased and impartial manner because the director's
decision may be motivated by the desire or necessity to
alleviate overcrowding in the facility and he or she may
thereafter be called upon to review his or her own decision
should an objection be raised. "To follow the rationale of the
[Supreme Court] would be to void almost all intra-administra-
tive appeals, where institutional pressures abound" *(Rennie v*

*Klein,* 653 F2d 836, 850, *vacated on other grounds* 458 US 1119, *on remand* 720 F2d 266). In this case, it is undisputed that after the first appeal at QHC, the director designated the associate director of psychiatry to hear such appeals. The procedure is available to the directors of all sending facilities *(see,* 14 NYCRR 517.4 [c] [3] [i]). In addition, the issue of overcrowding at the sending facility, which is clearly a concern relevant to the issue of which facility will better serve a patient's best interest, is one of many factors to be considered in determining the transfer issue. In any event, the receiving facility is to determine whether the patient would benefit from its services and can reject the patient, even after a transfer *(see,* 14 NYCRR 517.4 [g]; *see,* Mental Hygiene Law § 29.11 [d]). This veto power creates an independent, nonbiased review of whether the transfer is in the patient's best interest, and no evidence has been presented to the contrary *(see, Schweiker v McClure,* 456 US 188, 196-197; *Gorman v University of Rhode Is.,* 837 F2d 7, 15; *Boarding Home Advocacy Team v O'Bannon,* 525 F Supp 1181, 1191).

■ As to the appeal procedure set forth in 14 NYCRR 517.4 (c), the patients specifically alleged in their complaint that this procedure was constitutionally inadequate because it did not provide an opportunity for the patient to confront witnesses and present evidence, or for the use of the rules of evidence, the application of the legal standard of proof based on clear and convincing evidence, and the maintenance of a record of the proceedings. However, these additional procedures are not constitutionally required by the Due Process Clause. In light of the fact that the transfer decision involves the proper treatment to be afforded the patient, "the value of cross-examination to discredit a professional medical opinion at best is limited" *(Basciano v Herkimer,* 605 F2d 605, 611, *cert denied* 442 US 929). Further, neither in their complaint, motion papers nor appellate brief do the patients indicate what type of evidence should be permitted to be introduced, in addition to their clinical record, in order to assure a more reliable determination on the transfer issue. Similarly, the accuracy of the transfer decision would not be significantly enhanced by adherence to the rules of evidence or by the imposition of a legal standard of proof by clear and convincing evidence. While there is no requirement for formal record keeping, a written application for the order of transfer must be prepared, indicating the reasons for the application, including how the patient is expected to benefit from the transfer

(14 NYCRR 517.4 [b] [1] [i]), and including a summary of the appeal procedure and result in the case where the patient objects to the transfer (14 NYCRR 517.4 [b] [1] [vi]). Such documentation would appear to be sufficient, in addition to the patient's clinical record, for review in an appropriate proceeding pursuant to CPLR article 78 challenging the transfer. As previously noted, in such a proceeding, injunctive relief is available, if warranted, staying the transfer pending judicial review (CPLR 7805).

The State's interests in the outcome of this case are substantial in light of the considerable fiscal and administrative burden which would be caused by the imposition of a requirement for a judicial hearing prior to every transfer of an objecting patient *(see, Boarding Home Advocacy Team v O'Bannon,* 525 F Supp 1181, 1191, *supra).* In this regard, as previously noted, pursuant to the provisions of Mental Hygiene Law article 9, which have been found to be facially constitutional *(see, Project Release v Prevost,* 722 F2d 960), the "massive curtailment of liberty" *(Humphrey v Cady,* 405 US 504, 509) involved in civil commitment can occur initially without any judicial intervention. Under that statutory scheme, "the role of the judiciary is restricted, for the most part, to a review of the discretion exercised by the autonomous departmental office * * * of mental health" *(People ex rel. Powell v Warden,* 73 AD2d 654, 655, *supra).* We are not aware of any constitutional basis for a different standard of judicial involvement in this situation involving transfers from municipal facilities to State psychiatric facilities.

To the extent that the patients contend that the defendants are not complying with the regulatory scheme, their allegations are unsupported by any evidence in this record. A claim challenging the constitutionality of the regulatory scheme *as applied* must await an appropriate proceeding pursuant to CPLR article 78 *(see, Project Release v Prevost,* 722 F2d 960, 971, *supra; Matter of Kovarsky v Housing & Dev. Admin.,* 31 NY2d 184, 191).

## IV

In conclusion, Mental Hygiene Law § 29.11 and 14 NYCRR 517.4, are constitutional on their face to the extent they permit the transfers of involuntarily admitted mentally ill patients, over objection, from municipal facilities to State psychiatric facilities without prior judicial hearings as to the need for such transfers.

Accordingly, the judgment is reversed insofar as appealed from, on the law, without costs or disbursements, it is declared that Mental Hygiene Law § 29.11 and 14 NYCRR 517.4, are constitutional on their face to the extent they permit the transfers of involuntarily admitted mentally ill patients, over objection, from municipal facilities to psychiatric facilities operated by the New York State Office of Mental Health, without a prior judicial hearing as to the need for such transfers, and the complaint is otherwise dismissed.

MANGANO, J. P., EIBER and SPATT, JJ., concur.

Ordered that the judgment is reversed, insofar as appealed from, on the law, without costs or disbursements, it is declared that Mental Hygiene Law § 29.11 and 14 NYCRR 517.4, are constitutional on their face to the extent they permit the transfers of involuntarily admitted mentally ill patients, over objection, from municipal facilities to psychiatric facilities operated by the New York State Office of Mental Health, without a prior judicial hearing as to the need for such transfers, and the complaint is otherwise dismissed.