**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**CHRYSLER CORPORATION, Defendant.**

**Civ. A. No. 81-72347.**

United States District Court,
E. D. Michigan, S. D.

June 23, 1982.

Dorothy M. Smith, Jan C. Leventer, Detroit, Mich., for plaintiff.

Thomas G. Kienbaum, Detroit, Mich., for defendant.

MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

The Equal Employment Opportunity Commission (EEOC) alleges that the Chrysler Corporation has violated the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. §§ 621 *et seq.* by a program of both voluntary and involuntary retirement of workers. This federal question is currently before the Court on defendant's Motions to Dismiss Representative Claims, and for Partial Summary Judgment, and plaintiff's Motion for Preliminary Injunction all arising from the retirements under Chrysler's Special Early Retirement Program (SER) of approximately 1600 salaried non-bargaining unit employees, occurring in September, 1979, and April, July, and December of 1980. For the reasons set forth below, defendant's motions are denied and plaintiff's motion is granted in part and denied in part.

The EEOC has brought this action in its representative capacity [1] to enforce the ADEA's provision that "no ... [bona fide] employee benefit plan shall require or permit the involuntary retirement of any individual [between the ages of 40 to 70] because of the age of such individual;".[2] By

---

1. The ADEA as enacted was to be enforced by the Secretary of Labor according to §§ 11, 16 and 17 of the Fair Labor Standards Act (FLSA), codified at 29 U.S.C. §§ 211, 216 and 217. *See* § 7 of the ADEA, 29 U.S.C. § 626. All administrative functions and enforcement authority were transferred to the EEOC pursuant to Section 2 of the 1978 Reorganization Plan # 1. 43 F.R. 19807 (May 9, 1978), 92 Stat. 3781.

2. The full text of the pertinent subdivision provides:

 (f) It shall not be unlawful for an employer, employment agency, or labor organization—

 (2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual;

 § 4 of the ADEA; 29 U.S.C. § 623(f)(2) as amended by Pub. L. 95–256 § 2(a), April 6, 1978, 92 Stat. 189.

The age limits under the ADEA are set forth in § 12 of the ADEA:

 (a) The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age but less than 70 years of age. 29 U.S.C. § 631(a) as amended by Pub. L. 95–256 § 3(a), April 6, 1978, 92 Stat. 189.

its motion for preliminary injunction, the EEOC seeks reinstatement of all retirees who were retired contrary to ADEA's provisions, as well as back pay and liquidated damages, in addition to prospective relief enjoining Chrysler from further implementation of the special early retirement program.

Chrysler, by its motion to dismiss representative claims, seeks to limit EEOC's representation to the claimants named in the complaint, Messrs. McSorley and Sadowski. Defendant also seeks partial summary judgment that involuntary retirement, when the retiree's job has been eliminated, does not violate the ADEA.

## I. BACKGROUND

The Court takes judicial notice of the fact that defendant Chrysler Corporation was faced with an extreme economic crisis in 1979.[3] Chrysler was forced to make cutbacks in both the number of operating facilities and manpower. From a total employment of 256,200 in 1978, Chrysler ultimately reduced its work force to 101,159 as of August 21, 1981.[4] From 26,000 salaried employees who were not represented by a union as a bargaining unit, Chrysler reduced that work force to its present level of approximately 16,000. Of the roughly 10,000 Michigan salaried employees who lost their jobs during the 1979–80 reduction in force (RIF), approximately 1600 retired under Chrysler's SER program.

Chrysler's Pension Plan (plaintiff's Exhibit 74) and the Corporate Personnel Procedure (CPP) which implements it, CPP 2–1038 (plaintiff's Exhibit 76) provide for several different retirement programs depending on the age, years of corporate service and health of the employee. Normal retirement is available to Chrysler employees who have reached the age of 65 and have at least 10 years of corporate service. Chrysler Pension Plan § 2.2. Former employees with at least 10 years of corporate service are entitled to a deferred pension which pays full benefits depending upon the years of corporate service, upon reaching age 65. Former employees may begin to draw actuarially reduced amounts as early as age 55.

The focus of this litigation is Chrysler's provisions for early retirement under § 2.4 of its Pension Plan. The early retirement provisions in § 2.4A apply to employees between 60 and 65 years of age with 10 years of credited service;[5] to employees between 55 and 60 years whose corporate service when added to their age equals at least 85; and to those less than 55 years of age with more than 30 years of service who volunteer for retirement. Voluntary retirees who initiate the retirement request receive full pension benefits less an actuarial reduction to compensate for the longer period during which pension benefits will be paid. Employees who fall within the age and service categories, *supra*, and who are terminated may at their option convert that termination into a voluntary early retirement.

The Pension Plan also provides for early retirement at corporate option (COR) or under Mutually Satisfactory Conditions (MSC), for employees aged 55–65 with at least 10 years of corporate service. Chrysler's Pension Plan § 2.4B. Benefits under this subsection are the same as those available to "normal" retirees at the age of 65, in that they are not subject to an actuarial reduction, plus a temporary supplement comparable to Social Security benefits payable until the retiree qualifies for Social Security.

This COR/MSC retirement option has been denominated "Special Early Retire-

---

3. One result of this crisis was Congressional intervention which ultimately resulted in passage of the Chrysler Corporation Loan Guarantee Act of 1979, enacted January 7, 1980 by Pub. L. 96–185, 93 Stat. 1324 and codified at 15 U.S.C.A. §§ 1861–1875. The Corporation's predicament is set forth in the legislative history of the Act. 1979 U.S. Code Cong. & Adm. News 2787, 2789–95.

4. Chrysler's Roll Report of August 21, 1981 is the most current data before the Court.

5. *See* Chrysler Pension Plan § 2.3(b) for requirements for individuals between 60–65, p. 16, and § 2.3(c), for those between 55–60, p. 17.

ment" (SER) by Chrysler management. CPP 2–1038, pp. 47–48 (plaintiff's Exhibit 76). Employees qualify for SER in the event of (1) a permanent plant shutdown; (2) a layoff which appears to be permanent; (3) an employee's physical or mental inability to satisfactorily perform work due to a permanent partial disability; or (4) an employee's extended disability.

In 1979, Chrysler, by its Employee Benefits Committee decided to extend an offer of Special Early Retirement to all qualified employees in an effort to reduce the salaried work force. Notes from Employee's Benefit Committee Meeting, August 1, 1979, (plaintiff's Exhibit 77). The intent of the program was to offer retirement with full, i.e. actuarially unreduced, benefits to employees with requisite age and service, who were not yet 65, the "normal" retirement age. Employees accepting this offer would receive basic and temporary pension benefits, continue under group life insurance until age 65, corporation paid group medical benefits (see plaintiff's Exhibit 75, p. 5), and be permitted to retain income earned from other sources without diminution of pension benefits.

Under published guidelines for implementing the SER offer, employees who were offered early retirement and declined were not to be penalized by forced retirement.[6] Individual layoff decisions were not to be made until management was aware of how much of the reduction in force (RIF) had been accomplished by voluntary acceptances of SER. Chrysler initiated its program by distributing its offer letter to all employees eligible as of August 31, 1979, in September 1979. To meet its RIF objective, after receiving all the responses to the SER offer, Chrysler was nevertheless forced to lay off workers. Employees otherwise eligible for Corporate Option Retirement who did not volunteer for SER and were subsequently selected for a layoff deemed to be permanent were retired at corporate option rather than being laid off.

Because of the continuing crisis, SER programs were re-offered in April, July, and December of 1980. Each offer was made in the context that continuing layoffs would be necessary and those eligible for voluntary SER who refused might nevertheless be laid off permanently, not as retaliation for turning down the SER but to accomplish the RIF. At the end of this period of manpower reductions approximately 1600 had signed forms which indicated a voluntary acceptance of SER. In addition 30 employees eligible for voluntary SER, but who did not accept it, were retired at Corporate Option after they had been selected for permanent layoff.

The key issue before the Court is whether the RIF by either the voluntary SER or mandatory COR violates the ADEA, and if so what remedies are appropriate at this preliminary stage of the litigation. The Court must address the threshold question of which retirees the EEOC is currently representing in this opt-in class action.

## II. CHRYSLER'S MOTION TO DISMISS REPRESENTATIVE CLAIMS

The substantive provisions of the ADEA, whose purpose is to eliminate age discrimination in the workplace, are frequently analogized to those of Title VII which focuses on the elimination of discrimination due to sex, race, and national origin. See *Oscar Mayer v. Evans*, 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979); *Marshall v. Chamberlain Mfg. Corp.*, 601 F.2d 100, 104 (3rd Cir. 1979).

Congress eschewed the Title VII enforcement scheme in favor of the enforcement provisions of the Fair Labor Standards Act (FLSA). See *Lorillard v. Pons*, 434 U.S. 575, 578–80, 98 S.Ct. 866, 868–69, 55 L.Ed.2d 40 (1978).

Section 7 of the ADEA, 29 U.S.C. § 626, incorporates the civil penalties of the § 16 FLSA enforcement procedures, 29 U.S.C. § 216, and gives federal courts jurisdiction

---

**6.** Guidelines and information for implementing September 1979 Special Early Retirement Offer

(plaintiff's Exhibit 75).

to enjoin violations of the ADEA under § 17 of the FLSA, 29 U.S.C. § 217.

The purpose of the FLSA is to enforce minimum wage and overtime compensation laws. Congress adapted the provisions to remedy ADEA violations by treating amounts owing to a person as a result of age discrimination as "unpaid minimum wages or unpaid overtime compensation." 29 U.S.C. § 626(b). Although prevailing employees are entitled to both unpaid wages and an additional equal amount as liquidated damages for any violation of the FLSA, 29 U.S.C. § 216(b), (c), under the ADEA liquidated damages are available only where the violation is willful. 29 U.S.C. § 626(b). The ADEA also provides for tolling of the statute of limitations for up to a year while the EEOC "is attempting to effect voluntary compliance . . . through informal methods of conciliation, conference and persuasion . . . ." 29 U.S.C. § 626(e)(2) (as amended April 6, 1978).

Under the FLSA/ADEA scheme, private individuals may bring suit on their own behalf or for "other employees similarly situated" for "employment, reinstatement, promotion and amounts owing due to violations of the Act, and liquidated damages." 29 U.S.C. § 216(b). Although employees similarly situated to the claimant may join in an individual's suit under § 216(b), the class action procedures of Rule 23 of the Federal Rules of Civil Procedure are not available to representative suits under § 16 of the FLSA. *LaChapelle v. Owens-Illinois Inc.,* 513 F.2d 286 (5th Cir. 1975). Unlike the traditional opt-out scheme of Rule 23, where class members are bound by the judgment unless they take affirmative steps to dissociate themselves from the litigation, under § 216(b) an aggrieved employee must opt in, and furthermore, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b); *La-Chapelle, supra.*

Under the FLSA, an individual employee's right to bring suit on his own behalf or join as a party plaintiff under § 16(b) terminates "upon the filing of a complaint by the Secretary of Labor in an action under Section 217 of this title in which (1) restraint is sought of any further delay in the payment of unpaid . . . wages . . . owing to such employee . . . or (2) legal or equitable relief is sought as a result of alleged violations of section 215(a)(3) of this title" [banning employer retaliation]. 29 U.S.C. § 216(b).

An individual's right to bring suit or join as party plaintiff under § 16(b) also terminates when the Secretary brings suit under Section 16(c) "to recover the amount of unpaid minimum wages or unpaid overtime compensation and an equal amount as liquidated damages . . . owing to such employee . . . ." 29 U.S.C. § 216(c).

The individual claimant under the FLSA has no right to initiate suit under § 17 because such causes of action may be brought only by the Secretary. 29 U.S.C. § 211(a). Under the ADEA, however, "[a]ny person aggrieved may bring a civil action . . . for such legal or *equitable* relief as will effectuate the purposes of this chapter: . . . ." 29 U.S.C. § 626(c) (emphasis added). *See Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978).

The rules governing an individual's right to sue on his own behalf, and that right's termination are more simple under the ADEA. "The right of any person to bring [a civil action for legal or equitable relief] shall terminate upon the commencement of an action by the [EEOC] to enforce the right of such employee under [the ADEA]." 29 U.S.C. § 626(c)(1), as amended. By incorporation of the FLSA into the ADEA, in an EEOC's suit under § 216(c), the statute of limitations continues to run against individual claimants until they are named or added as a party plaintiff in the complaint even though the lawsuit may be commenced by the Secretary's filing for other purposes.

In this suit, the EEOC, not private individuals, are seeking redress against Chrysler. The EEOC may, as both sides concede, seek redress solely under § 216 and gain

reinstatement,[7] back pay and liquidated damages, but no ban on future age discrimination; or solely under § 217 and gain reinstatement, back pay and prospective relief enjoining further violations, but not liquidated damages. *See EEOC v. Gilbarco, Inc.*, 615 F.2d 985, 991 (4th Cir. 1980). Because the relief under either section alone will not both make injured individuals whole, and also prevent future violations, to afford complete relief when representing a class as the EEOC is attempting to do here, the EEOC must sue under both sections. The EEOC, like individuals, may not bring a Rule 23 opt-out class action under either § 216(c) or § 217, but must follow the FLSA opt-in procedures under 29 U.S.C. § 216(c). *Donovan v. U. of Texas at El Paso*, 643 F.2d 1201, 1203 (5th Cir. 1981).

Chrysler's motion to dismiss all representative claims focuses on the requirement of § 216(c) that individual claimants must be named in the complaint as a party plaintiff or subsequently added to the litigation to toll the statute of limitations, and seeks to limit any relief the Court might award only to the claimants identified by name in EEOC's complaint—Donald McSorley and Leo Sadowski. The EEOC on the other hand seeks an order reinstating all of the approximately 1600 employees who elected SER or were retired at corporate option.

■ Section 16 of the FLSA explicitly states that the running of the statute of limitations against any individual is not tolled unless that person has consented to be a party plaintiff under § 216(b) by filing a written consent with the Court. *EEOC v. Gilbarco*, 615 F.2d 985, 988 (4th Cir. 1980). Section 17 contains neither a unique definition of commencement, nor any reference to an obligation of individuals to file consents. Ultimately in an opt-in class action where age discrimination has been alleged, the identification of individuals become significant for five different purposes: (1) tolling the statute of limitations, (2) enabling conciliation attempts, (3) determining whether a claimant has complied with statutory filing requirements, (4) terminating an individual's right to sue on his own behalf, and (5) procuring individual relief.

There is no requirement that the identification of individuals occur at a specific stage of the litigation for all of the above purposes; indeed, the lack of uniformity in this regard may account for the confused state of the law. The five purposes served by identifying claimants will be discussed seriatim.

(1) *Tolling the Statute of Limitations*

Although Chrysler has raised a pro forma affirmative defense that some claims may not be timely, it has presented no evidence on this issue, apparently relying on its argument, that there are only two claimants before the Court. Under § 216(c), an individual's consent is necessary to commence the EEOC's class suit with respect to a particular individual and toll the statute of limitations under this subsection. Thus, an individual who has not filed a consent to be a party plaintiff to EEOC's suit before the applicable period has run, will be barred from recovering back pay and liquidated damages under § 216(c). *Gilbarco, supra* at 991.

■ From the fact that Congress did not specify filing of consents—and thereby identification of individual claimants—as a prerequisite to tolling the statute of limitations for actions under § 217, this Court is justified in concluding that Congress did not so intend. "Because of the remedial purpose of the ADEA, procedural requirements not enacted by Congress should not be crafted by the court to bar claims." *Ewald v. Great Atlantic & Pacific Tea Co.*, 620 F.2d 1183, 1189 (6th Cir. 1980) (J. Jones,

7. Under the FLSA, reinstatement is available under § 216(b) only when a claimant has been the victim of a retaliatory action under § 15 of the FLSA, 29 U.S.C. § 215(a)(3). The Secretary may seek reinstatement under § 216(c) to the same extent an individual may under § 216(b).

Likewise, the EEOC may seek reinstatement of an individual victim of age discrimination under ADEA § 7 which treats any prohibited act under § 623 (including involuntary retirement) as a prohibited act under FLSA § 15, 29 U.S.C. § 215. *See* 29 U.S.C. § 626(b).

dissenting). Thus, in accordance with the foregoing analysis, the Court declines to require individuals to file consents in order to toll the statute of limitations under § 217. The statute of limitations under § 6 of the Portal to Portal Act, 29 U.S.C. § 255, is a conventional procedural statute of limitations, not a condition precedent. Written consent is not required to toll the statute in § 17 actions. *Hodgson v. Humphries*, 454 F.2d 1279, 1284 (10th Cir. 1972). The Court is not precluded by this, however, from requiring some affirmative participation by putative claimants in a later stage of this proceeding.

Furthermore, although under § 216(c) an individual's omission of filing consents may not toll the statute of limitations as to that person, such omission does not necessarily mean a suit has not been validly commenced for other purposes. To be eligible for liquidated damages (available under § 216(c) in an EEOC suit)́, however, an individual discriminatee must file his consent within two years of a violation of the ADEA, or three years if willful. Although only two individuals have been named in the complaint, the Court finds that filing a complaint with the EEOC for age discrimination or participation as a witness at the instant hearing [8] constitutes the type of consent intended under § 216(c) to place the employer on notice of his potential liability for unpaid wages and liquidated damages which due process requires.[9] *Bean v. Crocker National Bank*, 600 F.2d 754, 759–60 (9th Cir. 1979) (collective notice of intent to sue and alleged pattern of discrimination, put defendant on notice that more than an individual claim was involved).

(2) *Adequacy of Conciliation Efforts*

■ Informal conciliation is an essential part of the ADEA's remedial scheme and is to be undertaken before litigation is commenced. *See Reich v. Dow Badische Co.*, 575 F.2d 363, 368 (2nd Cir. 1978). The plaintiff's failure to identify individual claimants compels the Court to address whether conciliation efforts can be adequate where the EEOC has not identified the claimants which it purports to represent.

■ Adequate conciliation has generally been held to require a minimum:

(1) informing the violator of ways in which he can bring himself into compliance with the Act, (2) telling him that terminated employees may recover back pay, (3) notifying him that the Department may institute legal action, and (4) assuring him that he may respond to the violations, in light of the possible remedy. *Marshall v. Sun Oil Co. (Delaware)*, 605 F.2d 1331, 1334 (5th Cir.) *reh. den.* 610 F.2d 818 (5th Cir. 1979).

Although conciliation which seeks retrospective individual relief as well as general prospective relief is best effected by "some discussion of the merits of individual cases," *Marshall v. AMC*, 475 F.Supp. 875, 878 (E.D. Mich. 1979), where system wide discrimination has been alleged and the impacted class has been adequately identified by corporate status and age, it is not necessary to name individuals for whom make whole remedies are sought to have adequate conciliation. *Marshall v. Western Electric*, 20 E.P.D. ¶ 30,190 (W.D.N.C. 1979).

■ An EEOC's suit under the ADEA is aimed at redressing a public wrong and does not require individual documentation of conciliation attempts on behalf of all potential claimants. To so require "would reward the employer who discriminates on a large scale and undermine the legislative goal of obtaining voluntary compliance in

---

**8.** In determining who has filed consents, the Court finds it indispensable that it be informed of all Chrysler retirees who have filed complaints with the EEOC. In the event retirees who participated as witnesses do not have any signed writing on file with the Court from which consent may be inferred, they will be deemed to have complied with that requirement if signed consents are filed with the Court

in accordance with deadlines to which the parties will stipulate, *infra,* page 66.

**9.** The filing requirement does not apply to any witness who has already commenced a suit on his own behalf; he will not be required to abandon it. *See Mistretta v. Sandia,* 639 F.2d 588, 590 (10th Cir. 1980).

these cases." *Marshall v. Sun Oil Co. (Delaware)*, 605 F.2d 1331, 1334 (5th Cir. 1979).

The record before the Court reflects that defendant had been duly informed of possible violations and the relief sought on behalf of some specific individuals. Correspondence indicates records concerning many of those who testified at the hearing were transmitted to the EEOC at its request by Mr. Crocker, the Equal Employment Opportunity compliance officer at Chrysler.[10] Although the record may be incomplete as regards conciliation meetings with respect to those individuals, throughout the correspondence before the Court, defendant responded to individual claims denying liability and refusing to conciliate—either maintaining that its Special Early and Corporate Option retirements did not violate the ADEA, or that a claim was not timely. Ultimately the EEOC informed Chrysler of the forwarding of its file to Washington to litigate nationwide defendant's policy of involuntary retirement. Chrysler responded by denying liability and declining a final opportunity to "conciliate" although it did not foreclose any possibility of meeting to "consider the facts and circumstances underlying the charges."[11]

The EEOC "is not required to continue [conciliation] efforts after the defendant has stated that it believes it has not been guilty of wrongdoing but may proceed to litigation to determine that issue." *Marshall v. AMC*, 475 F.Supp. 875, 879 (E.D. Mich. 1979). In this case, there are three distinct categories of retirees to which defendant may be liable for age discrimination: (1) retirees whose files reflect a corporate option retirement, (2) those whose files reflect an SER under mutually satisfactory conditions who later claimed that their retirement was actually coerced, and (3) individuals whose voluntary SER is unrebutted. Chrysler has denied any liability in connection with any of the categories. Of the three groups' claims, those of the first two—COR, and coerced MSC—are the most straightforward and the likeliest to be adjudicated as violative of the ADEA. Conciliation attempts as to this relatively circumscribed and adequately identified group of 30–33 COR claimants plus those who alleged coercion were adequate.

■ Furthermore, in light of defendant's insistence that their special early retirement program had been in no way discriminatory, it was reasonable for the EEOC to deem further conciliation efforts futile and proceed to litigation on behalf of all 1600. "If it is impossible to reach a settlement with one discriminatee, what reason would there be to assume the next one would be successful." *Oatis v. Crown Zellerbach Cor-*

---

10. The record reflects the following conciliation efforts:

A conference was held August 14, 1980 concerning the claims of Sadowski and McSor-

| | | | |
|---|---|---|---|
| Anthony Borawski | 5–14–80 | claim untimely | Ptfs. Ex. 33 |
| Albert Mathieson | no date | COR; permanent layoff | Ptfs. Ex. 35 |
| L. J. Keith | 8–6–79 | RIF; marginal employee | Ptfs. Ex. 36 |
| George Kuzmanovich | 8–11–81 | claim untimely | Ptfs. Ex. 37 |
| Richard Simpson | 4–6–81 | COR; permanent layoff —no ADEA violation | Ptfs. Ex. 38 |

ley—parties plaintiff in the current litigation. In addition Mr. Crocker on behalf of defendant answered EEOC's requests on behalf of the following individuals:

---

In a letter dated September 24, 1980, defendant declined to provide EEOC with information concerning all salaried employees terminated between August 15, 1977 and August 15, 1980 as requested in a letter from Bette Benedict of EEOC to Reginald Crocker of Chrysler, August 13, 1980. Defendant's refusal to provide this information may have contributed to plaintiff's failure to name individual claimants. The EEOC could, of course, have subpoenaed the information (the record is devoid of such action); nevertheless EEOC's omission does not support dismissal of all unnamed claimants.

11. Letter from Paul Heinen, Vice President and General Counsel of Chrysler, to J. Mitchell, Regional Attorney of EEOC, dated May 12, 1981. Attachment to plaintiff's answer to defendant's motion for dismissal of representative claims.

*poration*, 398 F.2d 496, 498 (5th Cir. 1968) (discrimination under Title VII). This is especially true when the discrimination alleged was due to a uniform policy rather than individual characteristics.

### (3) *Statutory Filing Requirements*

 Under § 7 of the ADEA an individual must advise the EEOC of his intent to sue at least 60 days before commencing a civil action in federal court, 29 U.S.C. § 626(d), and additionally file his notice of intent to sue [12] within 180 days of the alleged unlawful practice, § 626(d)(1), or within 300 days in a "deferral" state,[13] where prior resort to the appropriate state authority is required, § 626(d)(2). Michigan is such a state.[14]

The Supreme Court has recently held that prior resort by an individual claimant to a state agency where one is available is mandatory, not optional. *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979). Lower courts have subsequently limited that decision to *individual* claimants, and held it inapplicable when the suit has been brought by the Secretary of Labor or the EEOC. *Marshall v. AMC*, 475 F.Supp. 875, 882–83 (E.D.Mich.1979); *Marshall v. Chamberlain Mfg. Corp.*, 601 F.2d 100, 101 (3rd Cir. 1979); *Reich v. Dow Badische Co.*, 575 F.2d 363, 368 (2nd Cir. 1978).

### (4) *Termination of an Individual Claimant's Right to Bring a Private Suit Under § 216(b)*

An individual's right to sue on his own behalf to redress age discrimination is governed by § 7(c) of the ADEA, as amended, which states:

(c)(1) Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter: Provided, That the right of any person to bring such action shall terminate upon the commencement of an action by the Secretary to enforce the right of such employee under this chapter.

29 U.S.C. § 626(c)(1) amended as of April 6, 1978.

Thus an individual's right to sue under § 216(b) is cut off when the EEOC files a complaint under § 216(c) seeking "unpaid . . . wages or . . . liquidated . . . damages . . . owing to such employee." 29 U.S.C. § 216(c) (emphasis added); likewise § 216(b) provides that the "filing of a complaint by the [EEOC] in an action under § 217 . . . in which (1) restraint is sought of any further delay in the payment of unpaid . . . wages, . . . owing to *such* employee . . . or (2) legal or equitable relief is sought as a result of alleged violations of § 215(a)(3) . . . ," shall terminate an individual's right to sue on his own behalf, or to join as a party plaintiff in a § 216(b) opt-in representative class action.

Defendant's motion to dismiss representative claims implicitly raises the issue of whether a complaint filed by the EEOC which does not identify represented individuals, though validly commencing the lawsuit for some purposes, *supra,* can terminate the right of individuals to sue, who are otherwise required to opt-in in order to be party plaintiffs to any litigation. The defendant argues, in effect, that the EEOC should not be permitted to sue in a representative capacity without specifying the individuals represented since the result would be a denial of due process to unknowing and unnotified employees. While having some facial appeal, the defendant's rationale is not persuasive, at least, not until such time as the matter is fully developed. It would be particularly inappropriate at the preliminary stage of this proceeding

---

12. In this Circuit, timely filing of the notice of intent to sue is no longer considered to be jurisdictional, and is therefore subject to equitable modification, though giving the EEOC at least 60 days notice remains a jurisdictional prerequisite. *Wright v. State of Tennessee*, 628 F.2d 949, 953 (6th Cir. 1980).

13. A deferral state is one which has its own anti-discrimination legislation and enforcement mechanism. *See* 29 U.S.C. § 633(b).

14. Elliot-Larsen Civil Rights Act, M.C.L.A. §§ 37.2101 *et seq.*

and under the restricted reach of a Rule 12(b)(6) motion to dismiss. The discussion following illustrates the legal complexities and the need for further investigation and analysis.

A specific employee's right to sue is not cut off under § 216(b) and (c) or § 626(c) unless and until the EEOC "commences an action on *his* behalf." *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) (emphasis added). Under § 216(c), which requires the filing of an individual's consent to toll the statute of limitations running on that individual's claim, it would appear to be legally imprudent to cut off a person's right to bring his own suit until he has consented to be represented by another.

Under § 217 which does not require an employee's consent be filed to toll the statute of limitations and commence suit on the individual's behalf, the solution is perhaps even more clouded. A close reading of the language of § 216(b), the whole focus of which is securing individual redress, would suggest the same interpretation: an aggrieved individual cannot know the EEOC is seeking relief on *his* behalf until he has been identified as or consented to be a claimant under the suit.

The Court thus would be inclined to hold that an individual is not barred from commencing suit on his own behalf until the EEOC has identified him by name as one whose interests it intends to represent under § 217, or until the aggrieved has filed the requisite consents with the Court.

The foregoing reasoning has even greater attraction in cases of retirees who have already initiated litigation on their own behalf.[15] One district court has dismissed a previously commenced private suit when EEOC joined the sole claimant's litigation, *Jones v. City of Janesville*, 488 F.Supp. 795, 797 (W.D. Wis. 1980). Where there are multiple claimants, however, the better course would appear to be to allow individuals who have commenced suit prior to the EEOC's institution of a class action, and who choose to continue their private actions, to do so. *Mistretta v. Sandia*, 639 F.2d 588, 590 (10th Cir. 1980); or at the very least, to be notified of any jeopardy and to be given the opportunity to present their position to the appropriate court.

### (5) *Need to Identify Individuals For the Fashioning of Remedies*

Finally, defendant by its motion, asserts that claims of any aggrievants not named in the complaint should be dismissed because individualized remedies cannot be fashioned. This argument ignores both the equitable power of the court "to fashion a remedy, suited to the facts of the case at hand, which will best effectuate the purpose of the [ADEA] and do justice to the parties," *Combes v. Griffin Television, Inc.*, 421 F.Supp. 841, 843 (W.D. Okl. 1976), and the mandate of the Supreme Court for a district court to "conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." *Int'l Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 361, 97 S.Ct. 1843, 1868, 52 L.Ed.2d 396 (1977).

The essence of the requirements of identification of claimants is to inform defendant of the potential extent of his liability. *Bean v. Crocker Nat'l Bank*, 600 F.2d 754, 760 (9th Cir. 1979). In this case, the EEOC clearly informed defendant in numerous letters, of its determination that defendant's COR's violated the ADEA, and that relief was being sought for all employees so retired; the function of identification—notice of the employer's potential liability—had been effected. Subsequent discovery is adequate to fill in the blanks. *EEOC v. Gilbarco, supra*, 615 F.2d at 990.

### (6) *Notice to Potentially Aggrieved Retirees and Solicitation of Consents*

As discussed above, the statute of limitations is not tolled for individual claimants until they have filed written consents under

---

**15.** The Court is aware of Mr. Borawski's private suit under 29 U.S.C. § 216(b), Civil Action No. 80–30069, currently pending before Judge Harvey, and also Mr. Heiple's suit, Civil No. 81–70158 before this Court.

§ 216(c). To assure that no individuals who have participated in this litigation to date in a material way are uninformed of the affirmative steps they must take the Court will require notice and the solicitation of consent to be distributed to the following individuals:

1. All individuals retired at corporate option, as indicated by defendant's corporate personnel records.

2. All individuals who have filed complaints with the EEOC arising out of any of the four SER retirements.

3. Any individual who testified during the preliminary injunction hearing.

4. Any individual who signed an affidavit concerning defendant's Special Early Retirements, whether offered or received into evidence or not.

See *Braunstein v. Eastern Photographic Labs.*, 600 F.2d 335, 336 (2d Cir.) *cert. denied* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1046 (1979) (FLSA); *Lantz v. B–1202 Corp.*, 429 F.Supp. 421 (E.D. Mich. 1977) (FLSA); *Allen v. Marshall Field & Co.*, 93 F.R.D. 438 (N.D. Ill. 1982) (ADEA); *Monroe v. United Air Lines*, 90 F.R.D. 638, 639–40 (N.D. Ill. 1981) ADEA.

The parties shall, within 30 days of the filing of this order, submit a stipulated order which sets a schedule for submission of a notice form for the Court's approval, and the notification of the individuals designated above.

In sum, the Court is not persuaded that at this stage the issues are so clear as to dictate a dismissal of the EEOC's representation of unnamed parties. Therefore defendant's motion to dismiss EEOC's suit on behalf of individuals who are not included in any of the four categories above is denied without prejudice.

III. PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Having delineated three distinct classes of claimants: (1) Corporation Option involuntary retirees; (2) Coerced "voluntary" retirees; and (3) voluntary retirees, the Court is now able to discuss the four elements plaintiff must establish with regard to each of these groups to merit preliminary injunctive relief. Plaintiff seeks two types of preliminary injunctive relief: (1) prospective relief which would bar further implementation of defendant's allegedly discriminatory retirement policies, and (2) retrospective relief for each of the three groups of retirees, *supra,* including reinstatement, back pay and liquidated damages. In the Sixth Circuit, the standard for granting a preliminary injunction is no different in the context of a discrimination case. *See EEOC v. Anchor Hocking Corp.*, 666 F.2d 1037 (6th Cir. 1981). Thus, for EEOC to prevail on its claim for the extraordinary relief of reinstatement and other damages before trial, it must show the four prerequisites used in this Circuit as set forth in *Mason County Medical Ass'n. v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977).

1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the plaintiffs have shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by issuing a preliminary injunction.

*See also EEOC v. Anchor Hocking Corp.*, 666 F.2d 1037, 1042 (6th Cir. 1981).

To grant the relief which plaintiff requests, all four of these elements must be established as to each of the three groups of retirees.

A. *Likelihood of Success on the Merits*

The ADEA contains a general prohibition against discrimination by employers in hiring, promotion and discharge of employees within the protected age group, currently ages 40–70, because of age. The statute also contains three explicit exceptions [16] to the ban on age discrimination; bona fide

16. See the legislative history at 1978 U.S.C. Cong. & Adm. News 505.

occupational qualification or reasonable factors other than age, § 623(f)(1); discharge or discipline for good cause, § 623(f)(3), and observing the terms of a bona fide employee benefit plan, the one pertinent to the resolution of the issues before the Court. 29 U.S.C. § 623(f)(2).[17]

Section 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2), as amended April 6, 1978 by Public Law 95–256 § 2(a), 92 Stat. 189, is a clear statement of Congressional intent that involuntary retirements pursuant to corporate pension plans were a form of prohibited age discrimination. The 1978 amendment reversed the Supreme Court's holding that either mandatory or optional retirement within the protected age range was permitted as long as the retirement was pursuant to a bona fide pension plan which so required. *United Air Lines v. McMann*, 434 U.S. 192, 195–96, 98 S.Ct. 444, 446–47, 54 L.Ed.2d 402 (1977). The Supreme Court had relied approvingly on language in a Third Circuit opinion which distinguished between "discharge without compensation" and "retirement on an adequate pension." *McMann, supra* at 198, 98 S.Ct. at 448 (quoting *Zinger v. Blanchette*, 549 F.2d 901, 905 (3rd Cir. 1977)).

In amending § 4(f)(2) to its present language the Senate Committee on Human Resources criticized the *Zinger* and *United Air Lines* decisions and noted that "forced retirement extinguishes an individual's right to employment and thus is not excused by Section 4(f)(2) unless the retirement is based on some reason other than age, such as disability or poor perform-

ance." 1978 U.S. Code Cong. & Adm. News 513.

Cases decided under amended § 4(f)(2) have applied the interpretation as Congress intended. *EEOC v. County of Calumet,* 519 F.Supp. 195, 203 (E.D. Wis. 1981) (permanently enjoining grievant's involuntary retirement by employer; holding participation in pension plan did not constitute implied consent to retire at 60); *Criswell v. Western Air Lines, Inc.,* 514 F.Supp. 384 (C.D. Cal. 1981) (reinstating mandatorily retired employees and granting permanent relief barring mandatory retirement of defendant's Second Officers at age 60). Even prior to the 1978 amendments to the ADEA, courts in this district have held that retirements pursuant to a corporate pension plan which permitted mandatory early retirement violated the ADEA, where there was no evidence of worker inability to perform, *see Marshall v. American Motors Corp. (AMC),* 475 F.Supp. 875 (E.D. Mich. 1979),[18] and even in the context of a 50% RIF where the choice was not between job retention and retirement, but layoff and retirement.[19] Both District Courts mentioned that selection of particular employees for retirement because they have passed a threshold age was not the sort of passive observance of a mandatory retirement plan the Supreme Court had upheld in *McMann, supra.* In addition, new Final Interpretations of the ADEA promulgated by the EEOC as enforcement guidelines are in accord with these interpretations. *See* 29 CFR § 1625, 46 FR 47724 (Sept. 29, 1981).

---

**17.** (f) It shall not be unlawful for an employer, employment agency, or labor organization—

(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual; 29 U.S.C. § 623(f)(2) (1967) (prior to the 1978 amendment).

**18.** After the passage of the act, one element of the employer's discretion was removed. That was the right to consider age as a relevant factor in the decision to terminate an

employee. Age can enter into the decision only if it is actually linked with a decline in ability which otherwise constitutes good cause to terminate the employee.
*Marshall v. AMC,* 475 F.Supp. at 880.

**19.** Subsequent to these two District Court decisions the Sixth Circuit in *Carpenter v. Continental Trailways,* 635 F.2d 578, 581 (6th Cir. 1980) held that it found no violation by an employer in observing the provisions of a retirement plan in which involuntary retirement was optional with the management. The Court declined to apply the new 1978 prohibition on involuntary retirement retroactively. *Id.* at 580.

The language of the amendment, its legislative history and both agency and court interpretations support a holding that Chrysler's involuntary retirement of employees over 55 with at least 10 years of corporate service is a clear violation of § 4(f)(2) of the ADEA. 29 U.S.C. § 623(f)(2). Chrysler urged in its motion for partial summary judgment that involuntary retirement in conjunction with a reduction in force comes within the exemption of § 4(f)(1) because job elimination constitutes a "reasonable factor other than age." The legislative history casts some light on the interpretation of this phrase.

In discussing "reasonable factors" Congress mentioned "disability or poor performance," 1978 U.S. Code, Cong. & Adm. News 513, clearly related to an individual employee's ability to perform job duties. *See, e.g., Thompson v. Chrysler,* 569 F.2d 989, 990, 992 (6th Cir. 1978) (involuntary retirement predating 1978 amendment; medical disability is "reasonable factor other than age"). The Court has found no case law to support the proposition that job elimination or a reduction in force is a factor which renders an otherwise illegal involuntary retirement lawful.[20]

The exceptions to the ADEA are independent and distinct. *Marshall v. B & O Railroad Co.,* 461 F.Supp. 362, 374–75 (D. Md. 1978) *modified* 632 F.2d 1107 (4th Cir. 1980). ("Surely if Congress intended for 4(f)(1) to cover [a RIF by involuntary retirements], there would be no need to specifically exempt pension plans from the ADEA pursuant to Section 4(f)(2)."). Intermingling the provisions, by reading the exception "reasonable factor other than age" of (f)(1) into (f)(2) would clearly violate an otherwise unambiguous ban on forced retirement. If Congress had wanted to allow that practice when jobs are eliminated or during an RIF it could have so stated. Its failure to do so raises the strong presumption that employees within the protected age range may not be *forced* into retirement even in the face of job elimination or a RIF.[21]

■ Once Chrysler had selected an individual for termination as part of its Reduction in Force, his status was determined on the basis of age and corporate service. Those under age 55 without requisite corporate service were laid off with the possibility of recall in the order of seniority—even though realistically that possibility was slight. Those over age 55 with requisite corporate service were involuntarily retired with no chance of recall. From the facts before it, the Court is forced to conclude that where an employee with more than 10 years of corporate service was involuntarily retired, that retirement was solely on the basis of age.[22] There can be no doubt that decisions made this way violate the ADEA's ban on involuntary retirement, regardless of the economic circumstances impelling the job elimination, or the generosity of retirement benefits offered to involuntary retirees. *EEOC v. Con. Ed. of N.Y.,* 25 EPD ¶ 31,558 (S.D.N.Y. 1981). Therefore Chrysler's Motion for Partial Summary Judgment is hereby denied.

**20.** *Mastie v. Great Lakes Steel Corp.,* 424 F.Supp. 1299 (E.D. Mich. 1976) upheld the involuntary retirement of two men to effect a RIF necessitated by a plant closing. That case, however, predates the 1978 amendment barring involuntary retirement. *Ackerman v. Diamond Shamrock,* 670 F.2d 66 (6th Cir. 1982) held that the ADEA had not been violated because the employee's acceptance of a "rather generous" early retirement package had been voluntary, and the corporation's decision to eliminate plaintiff's job was a legitimate business decision, unmotivated by age discrimination.

**21.** An employer's resort to "reasonable factor other than age" has been further circumscribed by EEOC's new final interpretation:

When an employment practice uses age as a limiting criterion the defense that the practice is justified by a reasonable factor other than age is unavailable. 29 CFR 1625.(7)(c), 46 F.R. 47727 (Sept. 29, 1981).

**22.** 29 CFR 1625.9(f) states in part:

"Nor is it unlawful for a plan to require early retirement for reasons other than age." Chrysler's account of its RIF was that workers were selected for termination without reference to their age. Only after that decision was made did defendant determine whether termination should take the form of layoff or retirement. At that point no reason for retirement vis-a-vis layoff was implicated "other than age."

As a consequence of the foregoing, an employee whose personnel records reflect retirement at Corporate Option has shown a strong probability of success on the merits, the first of four elements which must be shown to qualify for preliminary injunctive relief. Only 30 some aggrieved retirees fall within this class.

There remain two other classes of claimants: coerced "voluntary" retirees who have rebutted the indication in their files that the retirement was under mutually satisfactory conditions, and, by far the largest group, those employees who accepted voluntary early retirement and have made no claim to rebut its voluntariness.

■ As to the first group, the Court notes that an indication of MSC status in a retiree's file is not conclusive of the voluntariness of that individual's retirement. Where an employee can adduce evidence that, contrary to corporate records and prescribed practices, he was coerced to retire and not laid off as younger workers were, the employee's retirement would be involuntary. These individuals have also demonstrated a likelihood of success on the merits.

Finally as to the unrebutted voluntary retirees: in the absence of any testimony that an individual's retirement was coerced, at this preliminary stage of the proceedings, the Court is compelled to conclude that the retirements were voluntary and that these individuals have not yet demonstrated any likelihood of success on the merits. Defendant Chrysler has moved to dismiss this group of claimants outright because of defendant's failure to specifically identify claimants. As discussed above, the Court is denying that motion at this time, but without prejudice, so that defendant may renew the motion at some later time. Members of this third group are not entitled to share in any of the preliminary relief granted to the first two groups.

### B. *Irreparable Injury*

Having determined that corporate option retirees and coerced "voluntary" retirees have demonstrated a likelihood of success on the merits, the Court must now consider whether these individuals have suffered irreparable harm because of defendant's unlawful involuntary retirements. *EEOC v. Anchor Hocking Corp.*, 666 F.2d 1037 (6th Cir. 1981).

■ The degree of irreparable injury which must be shown will vary inversely with the degree of likelihood of success on the merits. *See Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537–38 (6th Cir. 1978) (quoting *Metropolitan Detroit Plumbing and Mechanical Contractors Assoc. v. HEW*, 418 F.Supp. 585, 586 (E.D. Mich. 1976). Therefore, where, as here, the likelihood of success on the merits is strong the amount of injury noncompensable at law which must be shown to warrant preliminary relief is proportionately reduced.

■ Plaintiff seeks a ban on further corporate option retirements, and reinstatement of those already involuntarily retired. Where the retirements have not already occurred, a preliminary injunction is the logical means to maintain the status quo and obviate the irreparable injury of involuntary retirement. *See e.g.: EEOC v. City of Ecorse*, 26 EPD ¶ 31,988 (E.D. Mich. 1981). The more difficult question is whether the harm suffered by claimants warrants mandatory injunctive relief which generally requires a more substantial showing.

■ EEOC alleges as irreparable injury economic deprivation, and psychological and physiological problems. The Court's analysis must begin with the general rule in employment discharge cases that "temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974). Thus the Court cannot find that mere delay in payment of back salary constitutes irreparable injury; nor does the attendant financial disruption to a retiree's savings plans.

"The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the ab-

sence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974) quoting *Virginia Petroleum Jobbers Assoc. v. Federal Power Comm.*, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958) (original emphasis).

The Court is constrained to hold that any economic losses suffered by involuntary retirees that may be fully recompensed at the end of trial do not constitute irreparable injury.

The Supreme Court did note, however, that

cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence. We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual. But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation.

415 U.S. at 92, n. 68, 94 S.Ct. at 953, n. 68. This Court finds that the circumstances before it reflect a departure from the normal situation.

Legislators in amending the ADEA to expressly prohibit involuntary retirement expressed their concern for the adverse impact on older workers of an abrupt forced cessation of employment:

Substantial evidence exists that mandatory retirement may have a severe deteriorative impact on the physical and psychological health of older individuals.

Dr. Albert Gunn, assistant director for hospitals at the M.D. Anderson Hospital Rehabilitation Center, University of Texas in Houston, testified that mandatory retirement based on age often subjects workers to sudden and sometimes strong negative reactions that affect mental attitude, health and perhaps even longevity. It detracts from the quality of life by taking away a sense of fulfillment and self-sufficiency that many workers find can only be realized from productive employment. The American Medical Association opposes mandatory retirement. In its view, enforced idleness robs those affected of the will to live full, well-rounded lives, deprives them of opportunities for rewarding physical and mental activity. The AMA has observed that

Arbitrary segregation of individuals because of arbitrarily determined chronological age is not healthy for the nation or the individual. The sudden cessation of productive work and earning power of an individual, caused by compulsory retirement, often leads to physical and emotional illness and premature death.

1978 U.S. Code Cong. & Adm. News 507.

The record reflects that claimants have suffered emotional stress, depression and increased drug use (George Kuzmanovich); decrease in feelings of a useful and contracted social life (Donald McSorley); increased cigarette consumption (Richard Simpson); depression and lassitude (Anthony Borawski); sexual problems (Albert Mathieson); depression and a reduced sense of well-being (Richard Stapleton). It is significant to the Court's decision that the psychological and physiological distress suffered by the claimants is the very type of injury Congress sought to avert when it banned involuntary retirement.

Post-trial relief is inadequate to compensate claimants for this type of injury when it may be halted altogether by reinstatement. *Oshiver v. Court of Common Pleas*, 469 F.Supp. 645, 653 (E.D. Pa. 1979).

In addition, while the involuntary retirees are excluded from employment they suffer

a deterioration of their work skills through non-use and loss of currency in their area of expertise. An employee's prompt restoration to employment will work the minimum derangement on both employer and employee. *Reich v. Dow Badische Co.,* 575 F.2d 363, 368 (2nd Cir. 1978). Lastly, there is the factor that older workers by definition have relatively few productive years left, which if expended in pretrial delay are irretrievable. Where, as here, certain retirees are clearly entitled to reinstatement, the irreparable injury of further deterioration and enforced idleness is best avoided by reinstatement at this preliminary stage.

C. *The Balance of Harm to Defendant*

In concluding that a relatively small group of involuntary retirees have demonstrated irreparable injury, the Court is not unaware of defendant's countervailing arguments of economic hardship which necessitated the RIF at the outset, which reduced the salaried work force from 26,000 to 16,000.

 Although requiring the defendant to accommodate any retirees will doubtless cause some injury to and dislocation of its present work force, the hardship of reinstating less than 40 employees into a total work force of 16,000 appears less than the individual claimants will continue to suffer in their forced retirements. Even if the harm to claimants and defendants cancelled each other, claimants' likelihood of success on the merits must tip the scales in their favor. *See Delaware River Port Authority v. Transamerica Trailer Transport, Inc.,* 501 F.2d 917, 924 (3rd Cir. 1974).

D. *The Public Interest*

 Finally the Court must comment on the impact of a grant or denial of a preliminary injunction on the public interest. The plaintiff has focused on the injury to the public at large caused by involuntary retirement which perpetuates the inaccurate stereotype of older workers as nonproductive, as well as the public interests in enforcement of the law as written. *Marshall v. Sun Oil Co. (Delaware),* 605 F.2d 1331, 1335 (5th Cir. 1979). The defendant has

countered that the public interest is best served by allowing a struggling corporation to effect a reduction in force so that a viable entity providing employment will survive.

The Court is well aware of the deleterious effects on the State of Michigan as a whole should Chrysler cease operations altogether. The Court concludes, however, that the relatively limited relief necessary at this stage to prevent further irreparable injury to claimants favors the public's interest in both enforcement of the law, and maintenance of a viable economic base.

## IV. REMEDIES

First, the EEOC is entitled to a preliminary order enjoining further retirements at corporate option pendente lite. No Chrysler employee within the protected age range who is otherwise scheduled for permanent layoff shall be involuntarily retired on account of age alone, or in combination with corporate service or job elimination. This does not affect defendant's right to discharge or require early retirement when related to inability to perform, or for other cause. This order also does not prohibit continued implementation of its voluntary SER program as long as offers are made without coercion and acceptances are completely voluntary. *Final Interpretations,* 29 CFR 1625.9(f), 46 FR 47728.

The Court is aware of the heavy burden of proof on a plaintiff who seeks mandatory relief such as reinstatement rather than relief which maintains the status quo. *See Boarding Home Advocacy Team Inc. v. O'Bannon,* 525 F.Supp. 1181, 1188 (E.D. Pa. 1981). The Court finds, however, that an order reinstating all involuntary retirees and those coerced "voluntary retirees" who have come before the Court is mandated by the irreparable nature of the injury suffered by individuals and the obviousness of defendant's violation of the ADEA.

 The Court is aware that the EEOC sought much broader relief at this preliminary stage including back pay, with interest, and liquidated damages in an amount

equal to the back pay award. As noted above, continued withholding of unpaid wages until the final determination on the merits does not constitute irreparable injury. *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974). Therefore there is no need to award such relief at this time. Delaying the award of monetary damages will minimize the burden on defendant at this stage so that it could satisfy an award this Court might make at the conclusion of a full trial.

■ In addition the Court notes that an award of liquidated damages is discretionary under the ADEA (unlike the FLSA). *Hedrick v. Hercules, Inc.,* 658 F.2d 1088, 1095–96 (5th Cir. 1981). It would be both premature and imprudent for the Court to award liquidated damages without a full factual presentation from both sides in each individual case.

The Court's ability to fashion relief is hampered by plaintiff's insistence that complete relief, both retrospective and prospective can be granted without identifying individual victims of age discrimination. An additional stumbling block to determining who should be reinstated is the omission by either side to name all corporate option retirees, as indicated by Chrysler's official personnel files. The Court has been able to winnow from the voluminous record before it, evidence which indicates the following individuals have been retired at corporate option: Donald McSorley, Anthony Borawski, Albert Mathieson, Richard Simpson and L. J. Keith.[23] All of these individuals are entitled to be reinstated to their status with Chrysler at the time they were retired. The Court will entertain additions to this group upon production of corporate records that indicate an individual was retired at corporate option.

In addition the Court finds that the following individuals whose papers reflect retirement under mutually satisfactory conditions, were actually forced to retire because of the availability of retirement at corporate option: Leo Sadowski, George Kuzmanovich and Richard Stapleton.

Two caveats are appropriate at this time: First, the Court is *not* ordering involuntary retirees to return to Chrysler; it is merely requiring Chrysler to reinstate those retirees to their former status who desire to be returned. The Court is concerned that forcing individuals out of retirement who may have adjusted to and grown comfortable with their new status is potentially as harmful as the involuntary retirement of one who wishes to continue working.

Second, the Court is aware that individuals were not retired at corporate option unless they had already been selected for permanent layoff. As noted earlier, the issue has not been squarely raised as to whether the selection for layoff was made in a manner which discriminated against older workers because of age, and the Court does not reach it. That does not preclude the Court from finding subsequently that age discrimination was a factor in the layoff decisions, if the facts warrant it.

The Court only determines that employees, though 55 or older should not have been forced to retire, but rather treated identically with younger workers. Thus, practically, reinstatement of an individual may involve only a change in status from retiree to laid off employee. *See Cleverly v. Western Electric,* 594 F.2d 638, 640, 642 (8th Cir. 1979). While the Court assumes it may rely on Chrysler's good faith compliance with the spirit as well as letter of this order, it is concerned that individual claimants be very clear as to the scope of relief the Court is able to offer at this stage. Reinstatement does not necessarily mean a return to active employment and claimants must be aware of the possibility of immediate layoff when deciding how to respond to this order.

---

**23.** Mr. Keith's file reflects his COR in July of 1979—prior to defendant's large scale SER programs. Although there is some mention of marginal performance in his file, corporate records indicate he was involuntarily retired on the basis of age, service and a plant closing.

Clarence Bridgeman's affidavit is part of the record because it was attached to the complaint. Because it was not received into evidence at the hearing the Court declines to consider it, and notes incidentally that Mr. Bridgeman is seeking redress in a state court suit.

Whether the immediate layoff by defendant of an involuntary retiree would itself be age discrimination is a question not yet ripe for determination.

The Court does not expect claimants to decide whether to avail themselves of the reinstatement offer without specific information from Chrysler as to the nature of available employment and its attendant responsibilities. To that end, within 30 days of the filing of this order, the parties shall submit a stipulated order scheduling the following events:

(1) Determination of and notice to unnamed individuals who are entitled to reinstatement, because of their forced retirements.

(2) Notice to all individuals who are entitled to reinstatement, what their status and job duties would be upon returning to Chrysler.

(3) The interval during which claimants, once notified of their status, may accept or reject defendant's reinstatement offer.

IT IS SO ORDERED.

## ON MOTION FOR CLARIFICATION

This case is before the Court on plaintiff's Motion for Clarification of the Court's Order of June 23, 1982, which subsequently had been withdrawn to permit further briefing on the question of whether 29 U.S.C. § 216(c) as incorporated into the Age Discrimination in Employment Act of 1967 (ADEA) requires the Equal Employment Opportunity Commission (EEOC) to procure the consent of an individual before relief may be sought on that individual's behalf. Plaintiff EEOC makes three other "Requests for Clarification" that will also be discussed below. By this Order the Court reinstates its Opinion of June 23, 1982 subject to the clarifications below.

## I. CONSENT

The key issue is whether individual consents are required under FLSA § 16(c), 29 U.S.C. § 216(c). Specifically, the Court requested additional briefing to determine whether ADEA suits brought by the EEOC were "opt-in" or "opt-out" class actions.

Section 7(b) of ADEA, 29 U.S.C. § 626(b) provides that the enforcements provision of the FLSA be used to enforce the ADEA, incorporating 29 U.S.C. §§ 211, 216(b) and (c) and 217. When the ADEA was first enacted in 1967 the applicable portions of the FLSA, as most recently amended in pertinent part—granted the Secretary of Labor authority to compel payment of minimum wages and overtime pay (but not liquidated damages) on behalf of individuals (prior to 1961 the Secretary had no such authority) but required the individuals to consent to representation.

Section 216(c) appears to have been explicitly incorporated into the ADEA by *specific* reference (as opposed to general reference). According to canons of statutory construction:

A statute of specific reference, as its name implies, refers specifically to a particular statute by its title or section number. A general reference statute refers to the law on the subject generally.

2A Sutherland Statutory Construction § 51.07 at page 322.

Whether the incorporation by reference is specific or general determines the effect of amendments subsequent to the original enactment by incorporation. A general incorporation includes subsequent amendments, and a specific incorporation does not. *Id.*

The FLSA was amended in 1974, subsequent to the 1967 enactment of the ADEA to eliminate the consent requirement in § 216(c) suits brought by the Secretary, and to authorize the Secretary for the first time, to seek liquidated damages. FLSA suits on behalf of individuals may be brought by the Secretary without individuals' consent and are now duly commenced merely by naming each claimant as an individual plaintiff, as this Court permitted the EEOC to do by amendment filed August 3, 1982. FLSA § 16(b), which governs suits brought by private individuals on their own behalf and for others similarly situated (representative or collective actions), retains the consent requirement. Thus to be represented in an *individual's* suit (vis-a-vis

EEOC's suit) a similarly situated claimant must *opt-in.*

Chrysler's only argument for retaining the § 216(c) consent requirement in ADEA actions is that subsequent amendments do not apply because the FLSA was incorporated by specific reference. Only one case of those cited in *Sutherland* §§ 51.07 and .08 appears to designate an incorporation "specific" and thus refuses to give effect to subsequent amendments to the incorporated statute. *Muenich v. U.S.,* 410 F.Supp. 944, 946–47 (N.D. Ind. 1976). The majority of cases merely interpret the incorporation to be general and give effect to subsequent amendments. *See, e.g., U.S. v. Layton,* 509 F.Supp. 212, 225 (N.D. Cal.), *appeal dismissed,* 645 F.2d 681 (9th Cir.), *cert. den.* 452 U.S. 972, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981).

█ In rebuttal of defendant's argument, the EEOC cites language from the Sutherland's supplement: "A provision which, in terms, reads as a specific reference may, in context, be construed as a general reference." 2A Sutherland Statutory Construction, 1982 Supp. to § 51.08 at p. 108. It appears that when Congress designated specific sections of the FLSA enforcement scheme for incorporation into the ADEA, that "specific" reference was made only for the sake of clarity and to ensure all relevant civil enforcement provisions were available, while excluding certain criminal penalties. *See* 29 U.S.C. § 626(b). Congress intended to incorporate the general FLSA enforcement scheme, *Lorillard v. Pons,* 434 U.S. 575, 578, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978), and merely found it most convenient to do so by reference to specific sections. There is no evidence that Congress intended by such specific references any limitation on subsequent amendments which ameliorated the remedial scheme. This case is one of those where "[t]he surface specificity of the incorporating language [has] dissolved upon close judicial scrutiny." *Director, Office of Workers' Compensation Programs v. Peabody Coal Co.,* 554 F.2d 310, 324 (7th Cir. 1977). Here, as in *Peabody,* the complex interplay of two statutory schemes, one of which is incorporated into the other, warrants the conclusion that this facially specific reference actually operates as a general one. *Id.* Accord *Director, Office of Workers' Compensation Programs v. Eastern Coal Corp.,* 561 F.2d 632, 638 (6th Cir. 1977) (adopting the reasoning of the Seventh Circuit in *Peabody,* with reference to the same statutory scheme).

An alternative ground for the Court's determination that FLSA amendments subsequent to the ADEA's original enactment are also incorporated can be found in the exception to the general/specific dichotomy. Subsequent amendments are to be considered as part of the scheme when "the legislature has expressly or by strong implication shown its intention to incorporate subsequent amendments ..." 2A Sutherland Statutory Construction § 51.08 at 324.

Such strong implication is found in the legislative history of the subsequent 1978 amendment to the ADEA that was enacted after the 1974 FLSA amendment which dropped the consent requirement from § 216(c). *See* 1978 U.S. Code Cong. & Ad. News 504, 535.

█ In a conference agreement concerning the availability of jury trial for money damages under the ADEA, the conference committee explicitly referred to §§ 11(b), 16 and 17 of the FLSA. The Court may infer from this that Congress was familiar with the current FLSA scheme, particularly § 216(c) which was amended in 1974 to exclude the requirement of consent. The 1978 amendments cover significant changes to the ADEA, all of which focus on enhancing the remedial scheme; e.g.:

1. New ban on mandatory retirement;
2. Raising the upper age limit of coverage from 65 to 70;
3. Tolling the statute of limitations for up to a year to allow conciliation.

It is safe to assume that if Congress intended to retain as part of the ADEA the restrictive consent requirement which they had recently dropped from the FLSA enforcement scheme, the 1978 amendment

provided both the opportunity and vehicle for so doing. From Congress' failure to do so, this Court may infer that the elimination of consent requirements from the FLSA § 216(c) also removes that requirement from actions brought under the ADEA pursuant to FLSA procedures. Note that except for the incorporation provision of 29 U.S.C. § 626(b) the text of the ADEA itself is silent as to the identification of individual plaintiffs and commencement of ADEA action. The ADEA itself only provides for the termination of an individual's right to sue "upon commencement of an action by the Secretary to enforce the right of such employees under this chapter." 29 U.S.C. § 626(c)(1).

In addition to the guidance provided by the canons of statutory construction, there are other authorities which support this Court's conclusion.

As FLSA § 16(c) now stands it is silent about any requirement that individuals consent to representation by the EEOC. Indeed, it would appear anomalous to hold that Congress intended the restrictive interpretation which would require individuals to "opt-in". The Secretary has been given authority to institute suit, to name all plaintiffs he chooses, and subsequently to drop certain individuals on his own motion. It is not logical to assume that an individual could thwart the Secretary's authority by exercising a veto over the Secretary's decision, and Congress' intent that the statute be enforced.

Because of Section 16(c)'s silence, the only arguable basis for imposing a consent requirement is § 7 of the Portal to Portal Act, 29 U.S.C. § 256 which requires an individual's consent to a collective or class action before the suit is commenced on that individual's behalf and the statute of limitations tolled. The Court need not reach the question whether such consent is still required to toll the statute of limitations in a pure FLSA suit brought by the Secretary under § 16(c) to resolve the issue before it. The Sixth Circuit has refused to incorporate § 7 of the Portal to Portal Act, 29 U.S.C. § 256, into the ADEA statutory scheme.

*Morelock v. NCR Corp.*, 586 F.2d 1096, 1103 (6th Cir. 1978), *cert. denied* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 376 (1979).

Finally, two other District Courts have addressed the same issue and concluded that the EEOC is not required to seek the consents of the individuals on whose behalf it is enforcing the ADEA. *EEOC v. Blue Star Foods,* 22 FEP 504 (S.D. Iowa, 1980); *EEOC v. Wyoming Retirement System,* 27 FEP 1291 (D. Wyoming, 1981).

Therefore in response to the EEOC's Motion for Clarification, this Court holds that in a suit brought by the EEOC to enforce the ADEA, the individual claimants need not consent to be joined as party plaintiffs in this suit or to be represented by the EEOC. The Court does note that under § 16(c) the EEOC may on its own motion dismiss the case of individuals who prefer to pursue individual remedies on their own. Furthermore, the EEOC has represented that in the context of this litigation it is willing to do so. The availability of the dismissal procedure, however, does not convert ADEA enforcement actions under § 16(c) into a Rule 23 "opt-out" class action. Indeed, neither the nomenclature of "opt-in" or "opt-out" in an ADEA enforcement suit brought by the EEOC pursuant to Section 16(c) is appropriate.

In light of the foregoing conclusion parties should disregard the language in the Court's Memorandum Opinion and Order of June 23, 1982, which refers to the requirement of consent, procedures for solicitation of consent and characterizations of § 216(c) actions as "opt-in".

II. THE STATUS OF CHRYSLER EMPLOYEES WHO RETIRED UNDER MUTUALLY SATISFACTORY CONDITIONS (MSC), AND WERE NOT IDENTIFIED IN THE COURT'S ORDER OF JUNE 23, 1982.

By its request for clarification, EEOC seeks to expand the class of MSC retirees who rebutted the presumed voluntariness of retirement to the Court's satisfaction to potentially all 1,600 MSC retirees. The Court's order, when read in context, only

mandates reinstatement of all Corporate Option Retirees and the three "rebutted voluntary" retirees named in the last section of the Opinion. The subsequent indefinite reference to "unnamed individuals" refers only to unidentified Corporate Option Retirees—not all of the roughly 1,600 special early retirees.

To the extent that EEOC's motion relies on this case as being "pattern and practice", the EEOC has not made an adequate showing. This is not the sort of case which lends itself to class proofs because each offer of retirement was individualized. If defendant's own policies were followed to the letter, no discrimination occurred in any MSC retirement. Only if the policies were violated could there be discrimination, and that requires individual testimony. Plaintiff's request for this interpretation is denied.

### III. EEOC'S REQUEST FOR INPUT INTO THE REINSTATEMENT PROCESS.

The EEOC wants to participate in the process by which Chrysler determines the status to which retirees would be reinstated and has proposed a review schedule to prevent perpetuation of discriminatory decisions. Plaintiff urges that the decision to lay off an individual was based in part on that person's age and the availability of SER.

The Order does not require any EEOC input, the record does not support the inference that *lay off* decisions were age related, and the Court has expressly refused to consider the issue at this time. EEOC cites no authority for its request. The Court has earlier assumed that defendant can be expected to act in good faith in implementing the Court's Order, and Chrysler reaffirms that it will so act. Plaintiff's request to participate in reinstatement decisions is denied.

### IV. NOTICE TO CURRENT CHRYSLER EMPLOYEES

Plaintiff wants to notify all salaried non-bargaining unit Chrysler employees of this

litigation and the Court's Order. The two cases which plaintiff cites in support of such broad notice arose in the context of either actual or threatened harassment and retaliation against employees or union members who participated in Title VII claims. *EEOC v. Locals 14 & 15*, 438 F.Supp. 876, 885 (S.D.N.Y. 1977) and *EEOC v. Simpson Timber Co.*, 21 FEP 791 (W.D. Wash. 1979). Retaliation is not at issue here and these cases are inapposite. Therefore plaintiff's request for notice of this litigation to non-claimants is denied.

IT IS SO ORDERED.